No. 14443

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

_____

STATE OF MONTANA,

       Plaintiff and Respondent,

  -vs-

PRENTISS N. KIRKLAND,

       Defendant and Appellant.

_____

Appeal from:  District Court of the Thirteenth Judicial District,
           Honorable Charles Luedke, Judge presiding.

Counsel of Record:

    For Appellant:

        Lee Overfelt, Billings, Montana
        Gary D. Overfelt argued, Billings, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Sheri Sprigg argued, Assistant Attorney General, Helena,
         Montana
        Harold Hanser, County Attorney, Billings, Montana

_____

                Submitted:  September 11, 1979

                  Decided:  NOV 7 1979

Filed:  NOV 1979

Thomas J. Kearney

Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Defendant was convicted of aggravated assault following a jury trial in the District Court of Yellowstone County and sentenced to 30 years imprisonment without parole as a persistent felony offender. He appeals from the judgment of conviction, the sentence imposed, and denial of a new trial.

In the months preceding February, 1978, defendant Prentiss N. Kirkland had received several threats on his life. In December, 1976, his pickup truck was blown up by persons unknown. On February 12, 1978, he and Mary Gunsch were in the Squire Lounge in Billings, Montana when he received an anonymous phone call threatening to blow up his trailer house.

Later the same evening defendant and Ms. Gunsch drove to downtown Billings where they parted company. Defendant then entered the Royal Flush Lounge in the Custer Hotel where he sought out Charles Sparboe. Defendant asked Sparboe if they could talk and Sparboe assented.

There is a conflict concerning what occurred thereafter. According to defendant, he sat down opposite Sparboe and began discussing the threats he had received and the possibility of Sparboe acting as an intermediary. At some time during the conversation, defendant removed a gun from his coat and slammed it on the table to emphasize a point he was making. The gun discharged with the bullet striking Sparboe in the chest. Witness Betty Jean Baumgartner testified that both defendant and Sparboe were seated at the time of the shooting.

According to the victim Sparboe, he sat down while defendant remained standing. Without further conversation, defendant pulled a gun and shot him in the chest.

Thereafter defendant ran from the lounge and was apprehended about a block from the Hotel by Billings police.

On February 17, 1978, defendant was charged with attempted deliberate homicide. He retained his own counsel and plead not guilty.

On April 14 defendant filed a motion to change the place of trial alleging there had been an attempt by certain parties in the community to brand him as a paid assassin. On April 17 defendant moved that the weapon be produced for inspection; that the information be stricken because the attempt statute was unconstitutional in providing for a death penalty; and for a continuance of the trial on the grounds of lack of time and money to interview witnesses and lack of time to examine the weapon.

On April 17, the District Court denied the motion for continuance. On April 18 the District Court denied the motion to strike the information, denied the motion to change the place of trial pending jury selection, and noted that the record showed the prosecution's willingness to cooperate in the defendant's examination, inspection and testing of the weapon. On the same day the District Court granted the prosecution's motion to prevent the defense from suggesting to the jury that the death sentence was a possible punishment.

On the morning of April 18, the jury was empanelled and sworn. That afternoon the trial started. The jury was admonished not to form any opinion until they heard the entire case and not to talk about the case or allow anyone else to talk about it to them. No mention was made at this time about newspaper, radio or television news releases.

On April 21 during the course of trial, defense counsel moved that the jury be questioned concerning their exposure to telecasts from Billings television stations branding defendant as a hired killer. The presiding judge denied the motion stating that the voir dire examination of prospective jurors on the morning of April 18 had covered the telecast of April 17 and that the

- 3 -

jury had been admonished on the 18th not to read newspapers or listen to news accounts of the trial.

On April 24 defendant moved for a mistrial based on the news releases. The motion was denied. The same day both parties rested their case. The following day the jury returned a verdict convicting defendant of the lesser included offense of aggravated assault, a felony. Following denial of defendant's motion for a new trial, the District Court found defendant to be a persistent felony offender and sentenced him to 30 years in the State Prison without the possibility of parole or prisoner furlough.

Defendant appeals advancing seven specifications of error:

1. Denial of his motion to strike the information.

2. Denial of his motion for a continuance of the trial.

3. Denial of his right to question prospective jurors on the death penalty.

4. Denial of interrogation of jurors concerning their exposure to prejudicial news releases.

5. Errors in jury instructions.

6. Denial of a new trial.

7. Error in the sentence imposed.

Defendant contends that his motion to strike the information should have been granted because (1) the information failed to recite the code provision on deliberate homicide, and (2) the statute on attempt provides a possible death penalty in violation of constitutional prohibitions against cruel and unusual punishment.

Here the information charged defendant with attempted deliberate homicide. It specifically cited the attempt statute but did not cite the deliberate homicide statute. The applicable statute requires the charge to state the name of the offense and to cite "in customary form the statute, rule, or other provision of law which the defendant is alleged to have violated." Section

- 4 -

46-11-401(c), MCA.

Defendant's attack fails on two grounds. First, his motion to strike the information was untimely. The motion must be made before a plea is entered subject to an exception not applicable to this case. Section 46-13-103, MCA. Here the motion was made two months after entry of defendant's plea.

Secondly, the motion was properly denied on the merits. The test to be applied is "Would a person of common understanding know what is intended to be charged?" State v. Dunn (1970), 155 Mont. 319, 327, 472 P.2d 288. Here the information stated the crime charged, attempted deliberate homicide, and cited the attempt statute, section 45-4-103, MCA. Failure to specifically cite the deliberate homicide statute could not have deprived a person of common understanding of the crime charged particularly where he was represented by able and experienced counsel.

Defendant further contends that the information should have been stricken because a person convicted of attempted deliberate homicide may be sentenced to death under sections 45-4-103(3) and 45-5-102, MCA. He contends this constitutes cruel and unusual punishment in violation of Federal and State constitutional prohibitions.

His contention fails as he was neither convicted of attempted deliberate homicide nor sentenced to death. A defendant cannot question provisions of an act which do not apply to his case. State v. Johnson (1926), 75 Mont. 240, 259, 243 P. 1073. One who is neither injured nor jeopardized by the operation of a statute cannot challenge its constitutionality. State ex rel. City of Wolf Point v. McFarland (1927), 78 Mont. 156, 162, 252 P. 805. Since the trial of this case, we have further affirmed this principle in State v. Booke (1978), ____Mont.____, 583 P.2d 405, 35 St.Rep. 1249, and State v. Azure (1979), ____Mont.____, 591 P.2d 1125, 36 St.Rep. 514, 521.

- 5 -

Defendant next contends that it was reversible error to deny his motion for a continuance of his trial. The gist of his argument is that he was thus deprived of    due process and the right to effective assistance of counsel because he lacked time and money to investigate the facts surrounding the alleged crime and to examine and test the alleged weapon.

Defendant was incarcerated throughout the pretrial period. His motion for a continuance was made and denied on April 17, the day before trial. The gun allegedly involved in the shooting was returned to the prosecution on April 14 from the FBI laboratory. The prosecution furnished defendant's counsel a list of its witnesses, their proposed testimony, and cooperated with defense counsel in making the weapon available for inspection and testing after it was received back from the FBI laboratory.

The question of whether denial of a motion for continuance is reversible error was addressed four years ago by this Court and the following principles emerged:

> "Motions for continuance are addressed to the discretion of the trial court and the granting of a continuance has never been a matter of right. (Citation omitted.) The district court cannot be overturned on appeal in absence of a showing of prejudice to the movant. (Citation omitted.)

> "Defendant's argument therefore must stand or fall on the issue of prejudice, for the district court can be said to have abused its discretion only if its ruling was prejudicial. We have not found a single case . . . in which the denial of a motion for continuance was reversed without a showing of resulting prejudice to the movant."
> State v. Paulson (1975), 167 Mont. 310, 538 P.2d 339.

Defendant's claim of lack of time to investigate the facts surrounding the alleged crime has a hollow ring. Two months elapsed between entry of defendant's plea and his motion for a continuance. The prosecution furnished him a list of its witnesses and their statements. Defendant states that there is sufficient conflict and vagueness in some of the statements to warrant an

- 6 -

independent investigation and interview. What conflict? What vagueness? What witnesses? The record is barren. Defendant also claimed lack of funds to hire an investigator until shortly before trial. Yet he was able to hire his own attorney, did not request the court to pay for an investigator from public funds, or claim indigency.

Defendant also claims inability to examine and test the weapon and to secure expert testimony regarding the weapon because of time constraints. Defendant clearly had time to examine and test the weapon prior to trial. He arguably did not have time to secure expert testimony regarding the weapon. But here his defense was based on accidental discharge of the gun. The expert witness for the prosecution testified the weapon had "a potential for accidental discharge." Where is the prejudice?

For the foregoing reasons, the District Court did not abuse its discretion in denying defendant a continuance of his trial. There is nothing to indicate he was prejudiced or denied a fair trial by reason thereof.

Defendant claims reversible error because he was denied the right to question prospective jurors on the death penalty. As previously discussed he has no standing to raise this issue because he was not convicted of a crime involving the death penalty nor was he sentenced to death. Our prior holdings in Johnson and McFarland together with our subsequent rulings in Booke and Azure establish this principle.

Defendant's principal specification of error is the refusal of the District Court to permit interrogation of members of the jury concerning their exposure to inflammatory and prejudicial news releases indicating he was a hired killer.

Defendant's motion seeking interrogation of jurors was made on April 21 following 3-1/2 days of trial testimony. He supported his motion by three news releases. The first was aired

over a Billings television station on April 17, the day before trial:

> "Prentiss Kirkland is being tried for attempted
> deliberate homicide. He used a .38 caliber
> pistol to shoot Sparboe in the chest on February
> 12th. According to district court records, how-
> ever, police have received information that Kirkland
> was hired by an unknown person or persons to shoot
> and kill Sparboe."

The second news release was from UPI on April 17:

> "They believe that Kirkland was paid to shoot
> Sparboe who was wounded on February 12th. Police
> say Sparboe was shot in the chest at close range
> by a man using a .38 caliber pistol. According
> to district court records . . . police have re-
> ceived information that the defendant Kirkland
> was hired by a person or persons unknown to shoot
> and kill Sparboe."

The third was aired over a Billings television station on April 18:

> "Police have received information that the defen-
> dant was hired by an unknown person or persons to
> shoot and kill Sparboe."

The apparent source of this information was an application for a search warrant to inspect defendant's bank records appearing in the District Court file and reading as follows:

> "In attempting to determine defendant's motive for
> allegedly shooting Sparboe, police have received
> information that defendant was hired by unknown
> persons(s) to shoot and kill Sparboe. Investiga-
> tion reveals that Sparboe is a financially success-
> ful businessman, whose estate is estimated at well
> over $5 million, and several persons could profit
> by his death. Investigation reveals that it is com-
> mon hearsay among persons acquainted with both the
> victim and the defendant that defendant was hired
> to shoot and kill the victim. At the time of de-
> fendant's arrest, he was searched and booked into
> the county jail, where all his personal effects were
> seized and held as evidence. In his wallet were
> found certain bank deposit receipts, for account
> #427856 at First Citizen's Bank in Billings, reflect-
> ing deposits of over $25,000.00 in the last eight
> months. One deposit alone accounted for $22,000.00.
> There is no evidence that defendant has been employed
> during this period of time, or that he has any legit-
> imate source of income."

The application for search warrant was filed on March 14. The warrant was issued. The search was made and the return filed on

March 14.

On April 14 defendant moved for a change of the place of trial on grounds "that there has been an attempt by certain parties in the community to brand [the defendant] as a paid assassin." (Bracketed identification paraphrased.) The motion was denied on the first day of trial "pending jury selection efforts." It was not renewed thereafter and is not specified as error in this appeal.

Defendant's motion to interrogate the jurors on their exposure to these news releases was made on April 21, the fourth day of trial. It was denied on the basis that the voir dire examination of prospective jurors on April 18 covered "their knowledge of notoriety in the press" which would seem to cover the two releases of April 17 and that on the 18th "the jury was specifically instructed not to read newspaper accounts nor to listen to television or radio reports of the trial." In fact the admonition of the 18th did not specifically cover the latter.

However, on the 19th the court specifically stated to the jury: "I request that you do not read newspaper accounts of this trial nor listen to radio nor television reports." A similar specific admonition was given again at the end of the day on April 19, the second day of trial, again at the end of the fourth day of trial, and again at the end of the fifth day of trial. In his instructions to the jury the judge stated:

> "In your deliberations you will only consider
> the testimony of the witnesses upon the witness
> stand and such exhibits as have been admitted in
> evidence. No juror shall allow himself to be
> influenced by anything which he may have seen or
> read outside of the evidence and exhibits received
> by the Court during the course of this trial."

We also note that at the close of the State's case-in-chief, defendant moved for a mistrial on the ground that publicity given the case had made a fair trial impossible.

The focus of our inquiry into this specification of error

is twofold: (1) What action is required of the trial judge when news releases prejudicial to defendant appear during the course of trial? (2) Did the prejudicial news releases taint any juror in this case?

We have not previously been confronted with determining what action, if any, a trial judge must take when prejudicial news releases are brought to his attention during the course of a criminal trial. Specifically, does the trial judge have a mandatory and affirmative duty to initiate an inquiry of the jurors to ascertain whether any of them had heard or read the prejudicial news release?

Some federal and state appellate courts require this. Typical of this view is the following statement by the United States Court of Appeals of the Seventh Circuit:

> " . . . the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity." Margoles v. U.S. (7th Cir. 1969), 407 F.2d 727, 735.

In accord: U.S. v. Hankish (4th Cir. 1974), 502 F.2d 71; U.S. v. Jones (4th Cir. 1976), 542 F.2d 186; State v. Keliiholokai (1977), 58 Haw. 356, 569 P.2d 891. It is noted that those courts that have adopted this rule, with the exception of the Hawaii Court, have apparently done so in their supervisory capacity over trial courts and not because the procedure is mandated by constitutional due process requirements.

A contrary view has been taken by the Kansas Supreme Court. That court adopted the rule that where the record on appeal fails to show that a single member of the jury was aware of the publicity and when it does not appear the publicity was massive, pervasive or disruptive of trial proceedings, no trial error appears for there is no showing that defendant was deprived

- 10 -

of a fair trial.  Its rationale appears in the following passage:

"In our judgment the disposition of this point
is governed by State v. Smith, 215 Kan. 34, 523
P.2d 691, and State v. Potts, 205 Kan. 42, 468 P.2d
74.  In Smith we held that a motion to inquire
during trial is not a proper method to determine
if members of a jury are aware of prejudicial arti-
cles published by a newspaper during a trial.  A
similar situation was before the court in Potts where
we stated that an inquiry pertaining to newspaper
publicity during the trial may place prejudicial
matter before the jury and create a basis for a mis-
trial and that the trial of a case should not be
interrupted for inquiry on each article published
by the news media.  In Potts in refusing to reverse
a criminal case on the grounds of prejudicial news-
paper publicity we emphasized that no attempt was
made at the hearing on the motion for a new trial
to show that any member of the jury was aware that
such an article had been published.  The rule to be
followed is that where the record on appeal fails
to show that a single member of the jury was made
aware of the publicity and when it does not appear
the publicity was massive, pervasive or disruptive
of the trial proceedings, no trial error appears
for there is no showing that defendant was deprived
of a fair trial.  Here the record on appeal fails
to show that a single member of the jury was made
aware of the newspaper publicity or that the pub-
licity was massive, pervasive or disruptive of the
trial proceedings.  In order to prove that members
of the jury were aware of the newspaper article,
counsel for the defendant could have requested a
poll of the jury after it returned its verdict.  In
the alternative he could have subpoenaed the jurors
on motion for a new trial to show that they had know-
ledge of the article.  Under the circumstances we
hold that there has been no showing that the defen-
dant was deprived of a fair trial because of preju-
dicial newspaper publicity."  State v. Stewart (1976),
219 Kan. 523, 548 P.2d 787, 793-94.

In accord:  Louisiana v. Hegwood (1977), ____La.____, 345 So.2d
1179; Commonwealth v. Nolin (1977), ____Mass.____, 364 N.E.2d 1224.

We are not persuaded to adopt a rule requiring a trial
judge in every case where a prejudicial news release is brought
to his attention during the course of a trial to launch an immed-
iate inquiry of the jurors to determine whether they are aware of
the offending publicity and if so, the effect of such publicity.
We prefer to leave that to the trial judge's judgment and discre-
tion, subject to his later review after verdict on appropriate
motion, and our review on appeal.  There are several reasons for

- 11 -

this. A mandatory, affirmative requirement of an immediate juror inquiry is an inflexible rule denying the trial judge discretion in controlling trial proceedings. Such inquiry might inject error into the trial where none existed before. An immediate, mandatory inquiry during the course of trial into every news article, radio broadcast or telecast that is potentially prejudicial in the fertile mind of defense counsel might well disrupt trial proceedings unnecessarily and divert the attention of the jurors from their principal function of determining the guilt or innocence of the defendant under the evidence produced at the trial. Finally, the need for such a rule is questionable as the defendant's right after verdict to inquire into, develop and indicate any prejudice is preserved. On appeal, the ruling of the trial judge on juror inquiry is subject to review.

We proceed to a determination of whether the prejudicial news releases in this case tainted the jury, bearing in mind the general rule enunciated by the Supreme Court of the United States:

> "The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. (Citation omitted.) Generalizations beyond that statement are not profitable, because each case must turn on its own special facts." Marshall v. U.S. (1959), 360 U.S. 310, 79 S.Ct. 1171, 3 L Ed 2d 1250.

The record in this case does not indicate continuous and massive publicity pervading the entire community which had a slop-over effect on the jury as in Estes v. Texas (1965), 381 U.S. 532, 85 S.Ct. 1628, 14 L Ed 2d 543, or Sheppard v. Maxwell (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L Ed 2d 600. Nor is it a case where several of the jurors admitted having read the prejudicial news article as in Marshall v. U.S., supra.

The core of this case is whether defendant was denied a fair trial by reason of three news releases, two of which were the day before the trial and the third on the first day of trial.

- 12 -

The record before us is barren of any indication that any juror was aware of the news releases. Defense counsel was permitted to voir dire the prospective jurors on their knowledge of notoriety in press. The selected jurors indicated they had not been influenced by media reports and they would render a verdict based only on the evidence introduced at the trial. At the time of voir dire examination of the prospective jurors, defense counsel was aware of an attempt to brand his client as a paid assassin. A month prior to trial the prosecution had filed an affidavit to the effect that the police had received information that defendant was hired by unknown person(s) to shoot and kill Sparboe. Four days before trial, defense counsel had filed an affidavit disclosing his knowledge of an attempt to brand his client as a paid assassin. Under such circumstances the District Court's denial of defendant's motion after 3-1/2 days of trial to interrogate the jurors on their exposure to the two news releases of April 17 was not an abuse of discretion.

The news release of April 18 occurred after the jury was sworn and the trial had commenced. Thus the jury was not interrogated on their exposure to this release. This telecast contained the same information included in the two news releases prior to trial, specifically that police had received information that the defendant was hired by an unknown person or persons to shoot and kill Sparboe. We find no reason to treat this telecast any differently in our analysis than the first two news releases.

Additionally we have previously pointed out the admonitions of the trial judge and his instruction to the jury. We further note that no facts were submitted on defendant's motion for a new trial indicating that any juror had been exposed to any of the three news releases.

For the foregoing reasons, we hold that the trial judge

- 13 -

did not abuse his discretion in denying the defendant's motion for interrogation of the jury on April 21.

Defendant's attack on the jury instructions is without merit. He contends that the instruction on attempted deliberate homicide is unconstitutional because the death penalty could be imposed. This attack fails for the reasons previously discussed under defendant's first specification of error and will not be repeated here.

Defendant argues that the District Court should have granted him a new trial because the victim Sparboe referred to an item not in evidence.

During his testimony Sparboe apparently took a beeper or pocket pager from the clothes he was wearing at the trial, indicated it was in his shirt pocket when he was shot, and that the bullet struck off it and broke a pen in the same pocket. Defendant's counsel asserts he did not hear this testimony at the trial, accordingly did not object, and only learned of it the next day. On appeal, defendant contends the prosecution suppressed this exculpatory evidence entitling him to a new trial.

This evidence was not suppressed by the prosecution. The state did not take possession of the pager nor consider it evidence. After defendant learned of its existence at trial, he did not attempt to have it admitted in evidence during the succeeding four days of trial. He did not request a continuance. He did not seek its admission in evidence or request the prosecution to do so. Evidence is not withheld or suppressed if the defendant has knowledge of the facts or circumstances, or if the facts become available to him during trial. State v. Rueckert (1977), 221 Kan. 727, 561 P.2d 850. See also Beasley v. State (Fla.Dist.App. 1975), 315 So.2d 540; Roman v. Commonwealth (1977), ____Ky.____, 547 S.W.2d 128; James v. State (1977), ____Tex.____, 546 S.W.2d 306.

The final specification of error is that the sentence of

30 years in the State Prison at hard labor without eligibility for parole or participation in the prisoner furlough program constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

Here the sentence was within the statutory limits. Section 46-18-502(1) and 46-18-202(2),/ A sentence within statutory limits is presumed not to be cruel and unusual punishment. U. S. v. Kuck (10th Cir. 1978), 573 F.2d 25. We have held this to be the general rule. State v. Karathanos (1972), 158 Mont. 461, 493 P.2d 326. Defendant has the burden of proving by a preponderance of the evidence that his sentence falls within an exception to the general rule. In re Jones (1978), ____Mont.____, 578 P.2d 1150, 35 St.Rep. 469. Here defendant has not done so. Thus his specification of error lacks substance.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

- 15 -