No. 81-89

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

THE STATE OF MONTANA,

                    Plaintiff and Respondent,

    vs.

DAN DUVAL WEAVER,

                    Defendant and Appellant.

Appeal from:  District Court of the Thirteenth Judicial District,
              In and for the County of Yellowstone
              Honorable Robert Wilson, Judge presiding.

Counsel of Record:

    For Appellant:

        Felt and Martin, Billings, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Harold F. Hanser, County Attorney, Billings, Montana

                    Submitted on briefs: October 15, 1981

                                    Decided:  NOV 27 1981

Filed:  NOV 27 1981

*Thomas J. Kearney*
                                Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a conviction of felony theft in a case tried in the Thirteenth Judicial District, State of Montana, in and for the County of Yellowstone. The case was tried to a jury and appellant appeals his conviction.

In this case the appellant was charged with four counts: Count I, theft, a felony; Count II, criminal mischief, a felony; Count III, an attempt; and Count IV, deceptive practices, a felony. At a pretrial hearing Count II was dismissed for lack of probable cause and at the same time appellant was granted separate trials on each of the counts. Appellant was tried on June 14, 1980, on Count III and after nine hours of consideration the jury was unable to reach a verdict.

On July 17, 1980, at the time of the State's motion to set a trial date for Count I, the trial court granted a request for a continuance because of allegedly prejudicial articles in the Billings Gazette. Several continuances were granted, and the case went to trial on October 7, 1980, at which time other counts against the appellant were excluded from the trial. Following his conviction of felony theft the District Court, on motion of the county attorney, dismissed Counts III and IV of the amended information in view of the fact he had been convicted of Count I.

On September 21, 1979, Michael Watts, a truck driver, reported to the Billings police that his flat-bed trailer, loaded with 6,072 eight-foot, 2 x 4 studs, with the Burkland Lumber Company of Livingston, Montana, marks on same, had been stolen from the Billings East Parkway truckstop. Watts had loaded this lumber at Livingston,

-2-

Montana, and had driven it to Billings on the evening of September 19. He parked it at the East Parkway Truckstop that evening and went to his home. The following day he checked and found the truck in place and the day after, the 21st, when he went out to get his flat-bed trailer, he found it missing.

The trailer, equipped with fold-down grain sides, traps, tailboard, headboard, and tarps, was owned by Watts who had been hired to haul the Burkland lumber to Winona, Minnesota. The lumber had been loaded according to standard Burkland Lumber procedures in steel-banded bundles and was worth about one dollar a board wholesale or a total of about $6,135 at mill price. Each board of wood bore a distinctive Burkland mill stamp on both ends, and each was stamped with an exclusive Burkland mill number, 161. Watts testified that at the time the timber was loaded it was secured with red tarps, which belonged to him and were tied down with yellow nylon rope.

The Watts stolen trailer was recovered twenty-five days later, fifteen or twenty miles from Billings in what is known as the Pryor Creek area. At the time it was recovered, it was missing the lumber, a tailboard, tarps, and other equipment.

Several weeks later in October 1979, while in the course of investigating a fire on the premises of appellant, officers of the Yellowstone County Sheriff's Department observed large quantities of new lumber stacked on the property of the appellant's Dry Creek meat packing plant. The lumber was all eight-foot, 2 x 4 studs, each bearing the distinctive Burkland Lumber markings and stamped with the

Burkland mill stamp, 161. When asked by Deputy Sheriff George Jensen on October 25, 1979, about the lumber that was stacked on his property, appellant told Jensen that some of the stacked lumber was his and some of it belonged to a friend. He told the deputy that he was using the stacked lumber for remodeling his sausage shop in Billings and his meat packing plant in Lockwood.

Upon later investigation Mike Boyett, a detective with the sheriff's department who was aware of the theft of the lumber, thought that the lumber on the Dry Creek property might be the lumber which had been reported stolen. The Burkland stamps, the mill number 161 on each stud, identified Burkland as the place of manufacture and this had been reported stolen approximately a month earlier. An investigation by Detective Boyett revealed that according to Ed Carroll, Burkland's superintendent, Burkland had not sold any lumber in Montana to any Montana retail outlet during the period of time involved herein and that the last lumber sold by Burkland to a Montana retail outlet had been in January 1977. Carroll told Boyett also that he was unaware of any retail purchases in small quantities from the mill by any Montana buyer during August or September 1979.

The appellant testified that he had no idea that the Burkland lumber was stolen. His story was that on the evening of September 20, 1979, he received an anonymous phone call from someone asking to store lumber on his property. He testified that he thought he recognized the voice on the phone but on reflection realized he did not. When asked about the lumber by Boyett he said that he agreed to store the lumber for a fee. Later he testified at the

-4-

trial that he agreed to store the lumber as a favor for the mysterious caller, but that he did not discuss with the mysterious caller the question of the fee for storage.

Weaver testified that sometime on September 21, 1979, a semi-trailer load of eight-foot, 2 x 4 studs appeared in his yard at the meat packing plant just south of Lockwood. An unseen tractor brought it there and an unseen tractor would haul the empty trailer away later that day. Appellant testified that when he went to work the morning of September 21, he was surprised to see the amount of lumber that was stored. He said when he looked at the load, he noticed five or six boards were wedged out from the trailer in the front part of the load and when he attempted to push the offending boards into alignment, the restraining strap broke and some of the lumber fell to the ground. It then was necessary to unload the lumber remaining on the trailer and have it stacked. By the end of the day on the 21st, there were about nine stacks of lumber on the property, carefully cross-hatched, behind or near the appellant's loading dock. Appellant testified he removed the majority of the wood from the trailer by using a front-end loader and in addition paid six persons to help stack the wood. The individuals employed to do this were told to work fast and they would be paid well. They were paid more than the going rate for their afternoon's work.

Sometime during that day Robert Young, an associate of appellant, came into the yard and helped himself with appellant's blessings to a pickup load of 2 x 4 studs for a house appellant was building for Young. No payment was made by Young to appellant for this amount of wood. Appellant

-5-

testified that sometime during the day after unloading the trailer and stacking the lumber, he received a mysterious phone call from the person who had called him the night before. He testified that no arrangements for removal of the trailer were made nor was there anything said about the safekeeping of the lumber. In addition, no service fee was discussed. He testified that he was told to sell the lumber at a price between sixty-five and eighty cents per board to unspecified persons who would pick up the wood and to anyone appellant knew who might be interested. Appellant's testimony was that as a builder he was aware that the retail price of a 2 x 4 stud was in excess of one dollar per board. According to appellant, he was told to keep a record of sales and after a three or four minute conversation the call terminated and he never heard from the caller again.

During the next two months the appellant disposed of the lumber by selling it; by giving it to his employees in lieu of wages; and by taking it to keep for himself. He sold an undetermined quantity of lumber to persons whose "names were called to him" and whom he did not know. He further testified that he collected no money from the purchases because the alleged mysterious caller had not instructed him on this detail.

Appellant sold some of the lumber to Robert Young at eighty-five cents per board, which was taken to the Bull Mountains and used to build Young's house. There is no showing that he collected any money for these purchases.

According to the appellant he allowed a Tracy Standifer and Jeff Moll to take some of the lumber. In Moll's case, appellant testified that neither he nor Young

wanted to pay Moll for his labor on Young's house, and to resolve this dispute, appellant told Moll to take his wages out in lumber from the stacks of 2 x 4 studs and sell it for whatever he could get. Moll sold about 200 studs under this arrangement.

According to his testimony, appellant thought that perhaps the owner or someone else might pick up the lumber at the meat packing plant without his knowledge and that as a result he would have nothing to show for the time and money he had expended in storing the lumber. He therefore took 230 of the studs for himself, storing them in his garage and sausage shop to protect his interest.

During the investigation, when it was determined by the sheriff's department that perhaps this was the stolen Burkland lumber, Deputy Sheriff Boyett removed a total of 3,144 of the studs from the meat packing yard. A total of 1,684 studs were taken from stacks on three locations in the yard. During that period of time, a neighbor informed the deputy there was more lumber in a shed where it could not be seen on the property, and the deputy and an assistant removed 1,460 studs on November 28 and 29.

In addition to the Burkland lumber recovered by the sheriff's department at the Dry Creek plant, a detective, Robert Hirschi of the Billings police department, recovered some 500 of the studs from other locations in and around Billings. This included 63 studs from the residence of Jeff Moll, an employee of appellant; 137 studs from the garage of appellant's Billings residence; 97 studs from inside the appellant's sausage shop in Billings. After obtaining a search warrant later in December, Detective Hirschi

recovered a stack of 230 studs from the residence of Robert Young, who lived in the Bull Mountains south of Roundup, Montana. He observed at the time he got these studs that a deck, a shed, and the framing of the upper portions of a house being built at the Bull Mountain site was entirely constructed of the Burkland 2 x 4 studs, and he photographed all of this. These photographs were submitted at the time of trial.

During the investigation Hirschi discovered on December 13, 1979, portions of the tailboard and the red tarps between a loading dock and a holding pen on the appellant's Dry Creek property. This property was identified by Watts, the truck driver, as his tailboard and tarps and as the equipment used by him on the trailer that was loaded with the Burkland studs which had been stolen from the Billings truckstop.

Trial commenced on October 7, 1980, and the following day, the Billings Gazette, the local newspaper, printed the following article concerning the background of the appellant:

"BUSINESSMAN RETURNS TO COURT

"Dan Weaver was never charged with arson for the fire that destroyed Dry Creek Meat Co. last Oct. 25. The law says that a man cannot be charged with arson for setting afire his own property.

"Instead, he was charged with criminal mischief in connection with the blaze that destroyed his meat packing business. Those charges were dropped for lack of sufficient evidence linking him to the crime.

"Last summer he was tried for attempted theft, accused of trying to defraud his insurance company by claiming fire-losses resulting from the incident that he didn't deserve. After nine days of testimony and a 10-hour deliberation the jury declared itself

hung.   Informed sources say that case may
[be] too expensive to re-try.

"Weaver, however, found himself back in court
this week this time charged with possessing
3,400 pieces of stolen lumber, initially
found by investigators near the burned meat
packing plant.

"County Prosecutor David Gorton told the jury
Tuesday that he wouldn't attempt to prove
that 34-year-old Weaver stole the two-by-four
boards, valued at one dollar apiece, from a
fully-loaded semi-trailer truck parked at a
Heights truck stop Sept. 21, 1979.

"But Weaver knew the lumber was stolen Gorton
told the jury in his opening remarks, and he
attempted to conceal the lumber at a number
of locations including Dry Creek Meat, a
sausage shop he had not yet opened and his
Eldorado Drive home.

"Attorney Ken Frazier told the jury that his
client, whom he described as an 'unsophisti-
cated businessman', received an anonymous
phone call late last September from a man
asking him to store some lumber for him.
Weaver, he said, was noncommittal but the
following morning discovered a fully-loaded
semi-trailer at Dry Creek Meat, 2752 Highway
87.

"When the businessman noticed that the lumber
was loosely stacked and attempted to tighten
the bands, half of the truckload fell on the
ground.   He later asked several of his
employees to help him stack the lumber near
the building and in a storage shed nearby,
his lawyer said.

"The following night Weaver got another phone
call asking him to sell some of the lumber,
which he did.  Part of the load was hauled to
the home of William Robert Young south of
Roundup, which Weaver was helping to build.

"Young is expected to testify today when
Weaver's case continues."

At the conclusion of the State's case on October 8,
1979, appellant moved for a mistrial on the grounds of
possible prejudice created by the article and this motion
was denied.

Two issues are presented for review:

1. Was appellant denied a fair trial because of a newspaper article published the second day of the trial?

2. Did the State fail to produce sufficient evidence to establish appellant's knowledge that the property was stolen?

Appellant argues his right to a fair trial, which is guaranteed by the Sixth Amendment of the United States Constitution and by Article II, Section 4, of the Montana Constitution, was violated in this criminal proceeding. Estes v. Texas (1965), 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543; Irvin v. Dowd (1961), 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751.

In denying the appellant's counsel's motion for a mistrial the court indicated that it felt it was best to admonish the jury and accordingly, this was done just prior to the evening recess on October 8, 1980:

> "THE COURT: Ladies and Gentlemen, you will recess at this time. Let me caution very strongly that you are to refrain from reading the Billings Gazette, now until you take this matter for deliberation. I want you to refrain from listening to the television broadcasts because I don't want you to inadvertently be exposed to any accounts that may be on the news concerning this case. I don't want you to be influenced in any way by any matter other than what you see and hear in this courtroom during this trial. There have been reporters present from time to time during this case. They have not been here continuously like you have. You are the ones that know more about this case than anyone else at this time and I don't want you to be influenced by news accounts or anything else until after you have this case for deliberation and make your own deliberation on it, so please refrain from exposing yourself inadvertently to any accounts that may or may not occur on television or in the newspapers until you are through with your deliberations. We will recess now until 10:00 tomorrow morning and I anticipate that the case will be given to you for deliberation sometime around noon tomorrow.

-10-

So you can prepare your private doings accordingly. You will be in deliberation tomorrow afternoon. We will recess now until 10:00 tomorrow morning."

Appellant argues that the trial court erred in its failure to grant a mistrial; and in the very least, that the court should have interrogated the members of the jury concerning their exposure to the inflammatory and prejudicial newspaper article published by the <u>Billings Gazette</u> on the second day of trial.

This Court has not gone as far as the case relied upon by appellant and urged for adoption in this case, Margoles v. United States (7th Cir. 1969), 407 F.2d 727, cert. denied, (1969), 396 U.S. 833, wherein the court set down the rule for that circuit in holding:

". . . the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity." 407 F.2d at 735.

See also, United States v. Hankish (4th Cir. 1974), 502 F.2d 71; United States v. Jones (4th Cir. 1976), 542 F.2d 186, cert. denied, (1976), 426 U.S. 922; State v. Keliiholokai (1977), 58 Haw. 356, 569 P.2d 891.

This Court recently in State v. Kirkland (1979), _____ Mont. _____, 602 P.2d 586, 36 St.Rep. 1963, sustained the conviction against the defendant's assertion that the trial court had erred in not allowing him to interrogate members of the jury concerning their exposure to allegedly inflamatory and prejudicial news releases. We refused to adopt the rule previously mentioned which required the trial

judge, in every case where prejudicial news releases were brought to his attention during the trial, to examine the jurors to determine whether any of them had read the prejudicial news release, and if so, the effect of the publicity. We held that ". . . we prefer to leave that to the trial judge's judgment and discretion, subject to his later review after verdict on appropriate motion, and our review on appeal." In Kirkland we noted that the abuse of discretion standard had been clearly set forth in numerous cases dealing with a change of venue issue. Such matters are addressed to the sound discretion of the trial court, and unless there has been a clear abuse of discretion, its ruling will not be disturbed. See also State v. Williams (1979), ___ Mont. ____, 604 P.2d 1224, 36 St.Rep. 2328; State v. Hoffman (1933), 94 Mont. 573, 23 P.2d 972; State v. Lewis (1976), 169 Mont. 290, 546 P.2d 518.

Appellant argues that even under the rule set down in Kirkland there was here a clear abuse of discretion in that under the circumstances, the court should have interrogated the jurors. He argues that in the instant case (1) the trial court had properly continued the trial date due to previous prejudicial news reports and therefore was cognizant of the potentially prejudicial possibilities of further news reports; (2) that the response from some of the veniremen during voir dire indicated that the publicity surrounding the appellant was known to some of the prospective jurors and one had been excused for cause; (3) the defense counsel had specifically requested prior to the trial that no mention be made of the appellant's previous criminal charges; (4) the court admonished the jury to

-12-

refrain from exposing themselves to the reports on only one occasion which was late in the afternoon of the day the article was published; and (5) contrary to Kirkland, the record in this case indicates continuous and massive publicity in the community.

On the record in this case the appellant was convicted of a felony theft following a fair trial by an impartial jury. There are no indications on the record that the appellant's right of fair trial was in peril at any stage by a massive publicity pervading the entire community and there are no specific instances of failure of the jurors' impartiality. The United States Supreme Court has held that in order to reverse a conviction on the ground of prejudicial publicity there must be an inherent lack of due process in the proceedings. Estes, supra, 381 U.S. at 532; Sheppard v. Maxwell (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600. Or, there must be a showing by the defendant of "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." Murphy v. Florida (1975), 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595; Irvin v. Dowd, supra, 366 U.S. at 723. In Marshall v. United States (1959), 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, the Supreme Court of the United States held:

> "A bare fear respecting the true state of the juror's mind has no place here. Error will not be presumed; after verdict the defendant has the laboring oar."

This has long been the law in Montana. Kirkland, supra. Here the appellant has failed to make the requisite showing of a prejudice on record.

In addition we note that the sole existence of the

-13-

publicity--that is, the article of October 8 which refers to two previous charges brought against appellant--also notes that the disposition of those charges was in his favor. The issues of the trial on theft were then in process. The article is a single, factual, noneditorialized account appearing in the middle of page B-1 of the paper; nothing distinguishes it from reports of other court cases that appear on that page. The article stated facts favorable to the appellant, that is, one of the charges had been dismissed for lack of probable cause and the other was tried resulting in a hung jury. This Court observed long ago in State v. Jackson (1890), 9 Mont. 508, 523, 24 P. 213, 217:

> "The day has passed when blank ignorance and stupidity in a juryman were his best qualifications for service. There is more intelligence on the modern jury; and intelligent persons, the statute contemplates, are able to read contemporary history, and still preserve their mental balance. On the trial of a case, highly improper and incompetent testimony may accidentally fall from the lips of a sworn witness on the stand. This occurs in nearly every trial. Such evidence is stricken out by the court, and the jury instructed to disregard it. The court herein had equal opportunity to correct any possible evil influence of the newspapers."

In a later case, State v. Board (1959), 135 Mont. 139, 143, 337 P.2d 924, 927, the Court considered the content of an article which did not reveal a prejudice so grave as to deny the defendant a fair trial by its effects. The article was not one capable of arousing community feelings or establishing a community opinion. Applying this rationale to the extensive publicity on record in the case of State v. Armstrong (1980), ____ Mont. ____, 616 P.2d 341, 350, 37 St.Rep. 1563, 1572, this Court noted: "We have no indication here that the published accounts were so

passionate as to excite undue prejudice against the defendant. State v. Logan (1970), 156 Mont. 48, 473 P.2d 833."

We have previously found that newspaper publicity which is not editorialized, which appears to be factually done, and which does not contain inflamatory statements will not constitute a showing of prejudice upon which to base an abuse of the trial court's discretion. State v. Bashor (1980), ___ Mont. ____, 614 P.2d 470, 475, 37 St.Rep. 1098, 1102; State v. Bischert (1957), 131 Mont. 152, 156, 308 P.2d 969, 971.

As previously noted, absent any indication on the record of prejudice to appellant so grave as to deny him a fair trial, we find the court below properly exercised its discretion by denying the motion for a mistrial. Here the admonition to the jury was sufficient to correct any damaging influence one news article might have had under the circumstances.

The second issue is directed at the question of whether there was sufficient evidence upon which the jury could reach a verdict convicting the appellant of theft, a felony, pursuant to section 45-6-301(3)(c), MCA.

The amended information charges that the appellant "purposely or knowingly obtained control over stolen property, to-wit: 3,400 2"x4" wood studs, of a value of more than $150.00, owned by Burkland Studs, Inc., and/or Lampert Lumber Co., and/or Western Trucking Company, knowing the property to have been stolen by another and used, concealed or abandoned the property knowing such use, concealment or abandonment probably would deprive the owner of the property

-15-

. . ."

Appellant argues that during the trial the State made a concerted effort to introduce as much evidence as possible tending to show that the appellant had possession of the allegedly stolen lumber and that he used or concealed the lumber. He argues that in reviewing the record the State failed to correctly identify the elements of the crime of theft as charged by neglecting to produce any evidence, direct or circumstantial, showing that appellant knew the lumber had been stolen at the time he took possession.

Appellant argues that he testified how he came into possession of the allegedly stolen lumber and never knew that it was stolen until after the police came out to investigate the fire at his plant. Appellant argues that the State had the burden of proving, beyond a reasonable doubt, that appellant knew the property was stolen at the time he received it and that it failed to carry that burden. Appellant relies on the fact that mere possession of stolen property is not in and of itself a criminal offense. State v. Peters (1965), 146 Mont. 188, 405 P.2d 642; State v. Jimison (1975), 168 Mont. 18, 540 P.2d 315.

As to the knowledge element of the offense the State's burden is set forth in section 45-2-101(27), MCA, which states:

> "Knowingly -- a person acts knowingly with respect to conduct or to circumstance described by a statute defining an offense when he is aware of his conduct or that the circumstance exists. A person acts knowingly with respect to the result of conduct described by a statute defining an offense when he is aware that it is highly probable that such result will be caused by his conduct. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a

-16-

person is aware of a high probability of its existence. Equivalent terms such as 'knowing' or 'with knowledge' have the same meaning."

To reach the verdict, the trier of fact had to conclude that appellant knowingly obtained control of the stolen lumber, knowing it to be stolen by another, and that he used, concealed or abandoned the lumber knowing that the owner would thereby probably be deprived of the lumber. Here there existed substantial credible evidence, consistent with appellant's guilt and inconsistent with his innocence, which persons of reasonable minds might accept as adequate to support their conclusions. See State v. Armstrong (1980), ___ Mont. ____, 616 P.2d 341, 346, 37 St.Rep. 1563.

In this case, the State first had to establish that appellant "knowingly" obtained control of the lumber. Under the statute above cited, this element was proved by establishing that he "was aware of his conduct in doing the act." Secondly, the State had to establish that he obtained control "knowing" the property to have been stolen. Under the statute this element was established by showing that appellant was "aware of a high probability" that the wood was stolen. Last, the State had to establish that appellant used the lumber "knowing" his use would probably deprive the owner of the property. This element was proved by showing that it was "highly probable that the result caused by his conduct" would deprive the owner of his property.

All of these elements were clearly proved in this case. Intent may be inferred by the jury from what the defendant says and does and from all the facts and circumstances involved in the transaction. State v. Jackson (1979), ___ Mont. ___, 589 P.2d 1009, 36 St.Rep. 169, 176;

-17-

State v. Hardy (1980), ___ Mont. ____, 604 P.2d 792, 37 St.Rep. 1. The facts and circumstances here established by the State are inconsistent with any conclusion other than the appellant was fully aware that he was exerting control over obviously stolen property and disposing of it in such a manner as to deprive the rightful owner of its use. The appellant erroneously contends his denial of knowledge and his explanation were unrefuted, and that as a consequence, the evidence supporting the requisite element of knowledge amounts only to suspicious circumstances insufficient to sustain the verdict are in error.

Here, appellant's explanations were not unrefuted. The testimony of witnesses and the testimony of appellant himself placed in evidence an abundance of facts and circumstances which contradicted all explanations given by him. Whether appellant's explanations were more credible than the evidence to the contrary, or whether they were merely incredible, was a question of fact for the jury to determine. The credibility of witnesses and the weight of their testimony are solely matters for the jury to determine. State v. Hart (1981), ___ Mont. ___, 625 P.2d 21, 27, 38 St.Rep. 133, 138.

With respect to the elements of knowledge, the evidence here is circumstantial. Circumstantial evidence need not be regarded as inferior evidence; if it is of such a quality and quantity as to legally justify a jury in determining guilt beyond a reasonable doubt, circumstantial evidence is sufficient to sustain a conviction. State v. Cor (1964), 144 Mont. 323, 326, 396 P.2d 86, 88; State v. Proctor (1969), 153 Mont. 90, 94, 454 P.2d 616, 618. In

determining the sufficiency of circumstantial evidence to make a case for the jury and to sustain a conviction all of the facts and circumstances must be taken into consideration collectively. State v. DeTonancour (1941), 112 Mont. 94, 98, 112 P.2d 1065, 1067.

We find under the circumstances here that there are facts consistent with appellant's guilt and inconsistent with his innocence. Accordingly, the evidence is sufficient to sustain the appellant's conviction.

Affirmed.

_____
                Justice

We concur:

_____
        Chief Justice

_____

_____

_____
        Justices

-19-