No. 89-366

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF MONTANA,

       Plaintiff and Respondent,

-vs-

FRANK HENRY,

       Defendant and Appellant.

APPEAL FROM: District Court of the Twentieth Judicial District,
In and for the County of Lake,
The Honorable C.B. McNeil, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

    Timothy J. Lape, Polson, Montana

    For Respondent:

        Hon. Marc Racicot, Attorney General, Helena, Montana
        Jennifer Anders, Asst. Atty. General, Helena
        Larry J. Nistler, County Attorney; Mark L. Stermitz,
        Deputy, Polson, Montana

Submitted on Briefs: Dec. 1, 1989

Decided: March 2, 1990

Filed:

_____
Clerk

Justice Diane G. Barz delivered the Opinion of the Court.

Defendant Frank Henry was charged by information with the offense of sexual intercourse without consent pursuant to § 45-5-503(1), MCA. Defendant pled not guilty. A jury trial was held January 5 and 6, 1989. The jury returned a guilty verdict on January 6, 1989. Defendant appeals the conviction. We affirm.

The following three issues are raised on appeal.

1. Whether the jury panel was selected contrary to law and in violation of defendant's right to a trial by a fair and impartial jury;

2. whether the District Court erred in denying defendant's motion to dismiss the charge based upon the alleged suppression of exculpatory evidence; and

3. whether the District Court erred in allowing into evidence photographs of scratches on defendant's torso.

On September 20, 1988, Samantha Kenmille accompanied her sister and brother-in-law, Lori and Darrell Gross, to the Wolf Den Bar in Polson, Montana. After consuming several beers at the Wolf Den, the trio went to the Smokehouse Bar where they remained until closing. While at the Smokehouse Bar, Darrell Gross introduced Samantha Kenmille to defendant, Frank Henry. Samantha had not met defendant prior to that evening. At the closing of the Smokehouse Bar, Samantha, Lori, Darrell and defendant left the bar to go to Jack and Zoe Dulongs' house for a party. At the Dulong residence, the defendant and Samantha engaged in conversation and became physically friendly by kissing. After about one and one-half hours

2

at the Dulong residence, defendant invited Samantha, Lori and Darrell to his house for a sauna. The four left in the Grosses' van, however, only defendant and Samantha were dropped off at defendant's house because Lori and Darrell decided to return to the party.

Once at defendant's house, the two sat in the living room and watched television. Prior to entering the sauna, Samantha expressed to defendant that she would like to leave. Defendant, however, insisted that she stay since the sauna was ready and he did not want to waste energy. Samantha followed defendant to the sauna and entered the sauna room by herself fully clothed. Defendant slammed the sauna door behind her and held it shut for ten or fifteen seconds. Samantha testified that defendant's antics frightened her. Upon opening the door, defendant laughed and told her that he usually takes his clothes off before taking a sauna. Defendant then left the bathroom area.

Samantha shut the bathroom door, undressed and entered the sauna alone wearing her bra and underwear. Defendant undressed in another room and joined Samantha wearing only his underwear. Defendant sat on the bench next to Samantha and kissed her. No other physical contact, hugging or foreplay occurred between them until defendant suddenly forced Samantha's legs apart and tore off her underwear. He also pushed her bra up and began slapping her breasts. Samantha testified that the slaps hurt and she became very afraid. During this time, Samantha tried to push the defendant away and forcefully told him "no." Defendant, however,

3

was on top of her, physically overpowered her and then had sexual intercourse with Samantha without her consent. Defendant failed to climax and then ceased the act of intercourse. Defendant subsequently left the sauna.

Samantha grabbed her clothes, got dressed, and ran out the door, leaving behind her torn underwear and coat. She ran back to the Dulongs' house to find her sister Lori and brother-in-law Darrell. Darrell testified that Samantha was crying and appeared very upset when she arrived back at the Dulong residence. Samantha told Lori and Darrell that defendant was a "jerk" and that he had "beat her up." All three--Samantha, Lori and Darrell--returned to defendant's house to get Samantha's coat because Samantha was afraid to go back to defendant's house by herself. On the way back to defendant's house, Samantha admitted to Lori that defendant had raped her.

Once at defendant's house, they knocked on the door and defendant answered the door wearing only a pair of pants. Darrell testified that defendant's chest was very red and his arm was scratched. While searching for Samantha's coat, Darrell discovered the torn underwear in the sauna. He confronted defendant, who initially denied doing anything. An argument ensued between the two men, and Lori at one point stood between the two men and tried to push defendant away from Darrell.

Lori and Darrell took Samantha to the police station where she was interviewed by Officer Erickson at approximately 5:30 a.m. Samantha was very upset and was initially unable the talk about the

4

incident. The officer detected an odor of alcohol but testified that she did not appear to be intoxicated. When he discovered that penetration had occurred, the officer called Detective Smith. Detective Smith marked and bagged Samantha's underwear and sent her to the hospital where she was examined. The examining nurse reported bruises on Samantha's left breast and inner thigh. The medical report specified that while no external pelvic trauma existed, Samantha was "crying," "quite upset" and "unable to talk."

Defendant was subsequently arrested on the afternoon of September 21, 1988, at the Smokehouse Bar in Polson. In his voluntary statement to the police, he contended that the act of sexual intercourse was consensual. Defendant was charged by information with the offense of sexual intercourse without consent as specified under § 45-5-503(1), MCA. Defendant pled not guilty. A jury trial was held January 5 and 6, 1989. The jury returned a verdict of guilty on January 6, 1989. Defendant appeals the conviction.

The first issue defendant raises on appeal is whether the jury panel was selected contrary to law and in violation of defendant's right to a trial by a fair and impartial jury.

In the present case, the court authorized the jury commissioner to excuse those prospective jurors who were drawn and called for this trial who had an obvious undue hardship. Those without an obvious hardship were required to obtain a personal excuse from the court. The court acknowledged that prospective jurors were dismissed prior to trial who had demonstrated an undue

hardship.

Defendant argues that six jurors were excused and that these jurors did not submit an affidavit stating their hardship nor was a record kept as to the reason these jurors were excused at the pretrial stage. Apparently, the basis of defendant's pretrial objection is that at least one of the prospective jurors from the jury pool, who qualified to serve as a trial juror, was not in fact called for this particular trial. Defendant therefore argues that under § 3-15-313, MCA, the jury panel was selected contrary to law and in violation of his right to trial by a fair and impartial jury. Section 3-15-313, MCA, provides that

> (1) The court or jury commissioner with the approval of the court shall excuse a person from jury service upon finding that jury service would entail undue hardship for the person or the public served by the person.
>
> (2) If a person believes jury service would entail undue hardship for him or the public served, he may make and transmit an affidavit to the jury commissioner for which he is summoned, stating his occupation or such other facts as he believes will excuse him from jury service. The affidavit shall be filed with the jury commissioner, who shall transmit it to the court. The court or jury commissioner with the approval of the court may excuse a prospective juror from jury service if the prospective juror satisfies the provisions of subsection (1).

In particular, defendant argues that the submitting of affidavits by those jurors who claim an undue hardship is mandatory under § 3-15-313, MCA, and that failure to do so created a material deviation in procuring a jury and therefore is a denial of defendant's constitutional rights. We disagree.

6

Section 3-15-313(2), MCA, must be read in light of all the statutes addressing juries and jurors. See §§ 3-15-101 through -802, MCA. In particular, § 3-15-401, MCA, provides that each year the chairman of the board of county commissioners and the county clerk and recorder of each county must meet for the purpose of compiling a list of persons to serve as prospective jurors for the ensuing year. Once these prospective jurors are drawn, the clerk shall serve them notice by mail and require a response by mail as to their qualifications to serve as trial jurors. The clerk may also attach "a form for an affidavit claiming an excuse as provided for in 3-15-313. . ." Section 3-15-505, MCA. If a prospective juror does not return an affidavit claiming an undue hardship, that prospective juror is then placed on the jury list for the term specified by the court. When jurors are needed for a pending trial, the jury commissioner will draw from the pool of jurors the number of jurors ordered to be drawn by the court. Section 3-15-503(1), MCA. Once the jurors are drawn from the pool, the prospective juror notified may then attempt to demonstrate an undue hardship so as to be excused from serving on that particular jury panel. Section 3-15-313(1), MCA. If the prospective juror succeeds in demonstrating undue hardship, the juror will be excused for that jury trial but will remain on the jury list for the remaining jury term and may be summoned to serve on a subsequent jury during that term. Contrary to what defendant asserts, however, the statutes do not demand the filing of an affidavit demonstrating an undue hardship at this stage of the jury selection

7

process. No deviation occurred in the selection of the impaneled jury in this case. The record demonstrates that thirty prospective jurors appeared on the morning of trial. Of the first twenty-four prospective jurors questioned, only one was excused for cause during voir dire, which left five prospective jurors called for jury duty who were never questioned. As this Court has frequently stated:

> The accused cannot complain if he is still tried by an impartial jury. He can demand nothing more. The right to challenge is the right to reject, not to select, a juror. If from those who remain, an impartial jury is obtained, the constitutional right of the accused is maintained.

Territory v. Roberts (1889), 9 Mont. 12, 14, 22 P. 132, 133 (citing Hayes v. Missouri (1887), 120 U.S. 68, 71, 7 S.Ct. 350, 352, 30 L.Ed. 578, 580); See also State v. Coleman (1978), 177 Mont. 1, 25-26, 579 P.2d 732, 747. In light of the above, defendant's assertion that he was denied his constitutional right to a trial by an impartial jury because of a deviation in the jury selection process is unfounded and without merit.

The second issue raised on appeal is whether the District Court erred in denying defendant's motion to dismiss the charge based upon the alleged suppression of exculpatory evidence.

Prior to trial, defendant had filed a motion in limine requesting the exclusion of all evidence concerning the scratches on his torso because it would potentially refute his defense of consent. Defendant claimed that the reason for exclusion of such evidence was "that its probative value is substantially outweighed

8

by the danger of unfair prejudice." The District Court denied the motion.

At trial, after the State had given its opening statement to the jury, defendant's attorney received from Officer Hunter a copy of a written statement by Lori Gross. The statement stated in pertinent part that:

> Frank let us in and Darrell asked Frank why he slapped Sam. He was saying he didn't and Darrell walked over to the sauna and picked up Sam's underware [sic], which were all torn. Darrell asked Frank about it and Frank started to attack Darrell so I stepped between them and held Frank back at my arm's length. He didn't have any visible scratches at this time even to when we left so it had to be by his own hand or by unintentionable [sic] mistake of my own hand holding him back . . .

The record demonstrates that neither defense counsel nor the prosecution had knowledge of Lori Gross's written statement prior to the trial. Upon discovery of Lori Gross's written statement, defendant made a motion to dismiss. The District Court denied the motion and afforded defendant an opportunity to either interview Lori Gross or subpoena her and call her as a witness prior to the defense concluding its case-in-chief. Defendant's counsel neither interviewed Lori Gross nor subpoenaed her as a witness. Defendant's counsel also did not renew his motion in limine, requesting the exclusion of all evidence concerning the scratches on defendant's torso.

On appeal, defendant's entire argument is based upon the alleged suppression of Lori Gross's written statement. Defendant argues that the alleged suppression of this statement prejudiced

him by denying him the opportunity to present it as an exhibit in support of his pretrial motion in limine. Defendant, however, had the opportunity to renew his motion in limine after the State's opening statement, but failed to do so. The defendant cannot now raise the issue on appeal when he failed to renew his motion before the District Court. As this Court stated in Rasmussen v. Sibert (1969), 153 Mont. 286, 456 P.2d 835, "[t]o hold otherwise would . . . put the trial court in error on an issue which had not been presented to it for ruling . . ." Rasmussen, 153 Mont. at 295, 456 P.2d at 840. In addition, defendant's argument alleging that the written statement was suppressed is without merit in light of State v. Kirkland (1979), 184 Mont. 229, 602 P.2d 586, where this Court held that "[e]vidence is not withheld or suppressed if the defendant has knowledge of the facts or circumstances, or if the facts become available to him during trial." Kirkland, 184 Mont. at 243, 602 P.2d at 595.

In light of defendant's failure to renew his motion in limine at the time Lori Gross's written statement was discovered and in light of this Court's holding in Kirkland, we uphold the District Court's decision to deny defendant's motion to dismiss the charge.

The third issue raised on appeal is whether the District Court erred in allowing into evidence photographs of scratches on defendant's torso.

Defendant argues that the District Court erred by allowing into evidence the photographs illustrating the scratches that were present on defendant's torso on the evening of September 21, 1988.

10

Defendant argues that the probative value of these photographs were never explained to the jury. Defendant also argues that these photographs were introduced to arouse the sympathies and passions of the jury and were not substantially necessary or instructive to material facts.

The question of an evidence's admissibility is a question of law, whereas the weight that is attributed to that evidence is left to the trier of fact. When determining whether a piece of evidence is admissible, a district court must find that the evidence is both relevant and competent. Rule 403, M.R.Evid., however, further provides that:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

At trial, a district court has the discretion in determining whether the evidence is relevant and also whether the factors in Rule 403, M.R.Evid. would preclude otherwise relevant evidence from being admitted. State v. Doll (1985), 214 Mont. 390, 399, 692 P.2d 473, 477. A district court therefore must determine whether the probative value of verified photographs outweighs any prejudicial effect. State v. Grant (1986), 221 Mont. 122, 136, 717 P.2d 562, 572.

The foundation testimony for the photographs in this case was provided by Detective Hunter. After being shown the photographs, Detective Hunter testified that he took the pictures on the night

11

they arrested the defendant and that the photographs accurately portrayed the scene that was photographed. The State's attorney subsequently questioned defendant as to the source of the scratches and as to whether Lori Gross clawed him with her fingernails. As this Court stated in State v. Sigler (1984), 210 Mont. 248, 688 P.2d 749, a jury is entitled to know the nature and extent of the injuries. Sigler, 210 Mont. at 256, 688 P.2d at 753. The photographs in this case were relevant in that they aided the jury in understanding the nature and the extent of defendant's injury. The photographs thus were also available to the jury to aide them in determining, along with the other available evidence, the possible source of the scratches. The probative value of a photograph does not necessarily need to be explained to the jury in detail for it to be properly admitted. The District Court did not err in determining that the probative value of the photographs outweighed the prejudice, if any, to defendant.

Affirmed.

_____
Justice

We concur:

_____

_____

_____

_____
Justices

12