No. 79-7

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

THE STATE OF MONTANA,

Plaintiff and Respondent,

vs.

DWAYNE FISH and JOHN
ALDIN HUBBARD,

Defendants and Appellants.

Appeal from:  District Court of the Eighth Judicial District,
In and for the County of Cascade.
Honorable H. William Coder, Judge presiding.

Counsel of Record:

For Appellants:

Morrison, Ettien and Barron, Havre, Montana
Robert Morrison argued, Havre, Montana
Lawrence A. Anderson argued, Public Defender,
Great Falls, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Mary B. Troland argued, Assistant Attorney General,
Helena, Montana
J. Fred Bourdeau  County Attorney, Great Falls, Montana
Tom McKittrick argued, Deputy County Attorney, Great
Falls, Montana

Submitted: November 11, 1980

Decided: DEC 3 0 1980

Filed: DEC 3 0 1980

Thomas J. Kearney
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This is an appeal from a conviction and judgment against the defendant Dwayne Morris Fish of attempted burglary and the defendant John Aldin Hubbard of mitigated deliberate homicide. The convictions followed a jury trial in the District Court of the Eighth Judicial District, County of Cascade.

At approximately 10:00 p.m. on the evening June 27, 1978, Dwayne Fish and Mary Skelton went to Wally's Bar in Black Eagle, Montana, just north and across the Missouri River from Great Falls, Montana, where George Miller was bartending. While in the bar Fish talked with Miller concerning a past-due money debt Miller owed him. After having a drink, Fish and Skelton began to leave. At that time, some profanities were exchanged between Miller and Ms. Skelton. As a result of the exchange, a fight ensued between Fish and Miller with Miller seemingly getting the better of it. After a brief time, a patron of the bar grabbed Fish and pulled him away from Miller. The patron testified that, as he separated the two men, Fish told Miller that he was going to kill him. Fish left the bar with Skelton.

After leaving Wally's Bar Fish took Ms. Skelton home and mentioned that he was going back to the bar to continue his fight with Miller. Skelton suggested that she should call her brother, John Hubbard, for help, but Fish rejected the suggestion and told her to stay home.

Skelton did call her brother, John Hubbard, and related what had happened between Fish and Miller. Hubbard agreed to help and subsequently met his sister at the Riverview Lounge in Great Falls.

In the meantime, Fish returned to Wally's Bar. Fish parked his car nearby and was approaching the bar when the owner confronted him. Fish requested that the owner get Miller to come out, but Miller declined and Fish left.

Skelton and Hubbard, after meeting, left for Wally's Bar to find Fish. Upon arriving at Wally's, they were informed by the owner that Fish had come back but had left again. Skelton and Hubbard then went to the Grey Horse Bar and Saloon in Black Eagle, where they found Fish.

Hubbard advised Fish that it would not be wise to return to Wally's Bar to fight Miller because the bar was full of Miller's friends. Fish stated that the fight was between him and Miller and for Hubbard to stay out of it. A patron of the bar testified that he heard Fish and Hubbard say they were going to get Miller.

Fearing that Fish would be in for quite a beating if he returned to Wally's Bar Skelton and Hubbard left to find some friends to even up the odds. Skelton and Hubbard went to the Little Chicago Bar, in Black Eagle, where they found Dale Lodge, a close friend of John Hubbard.

Skelton, Lodge and Hubbard went back to the Grey Horse where they found Fish sitting at the bar. Skelton, Lodge and Hubbard began to play pool while Fish continued to sit at the bar. At closing time, Skelton and Fish left the Grey Horse and headed towards Wally's Bar in Fish's automobile. Understanding that there would be a fight between Fish and Miller at Wally's, Hubbard and Lodge followed.

Upon arrival at Wally's Bar, Hubbard parked his truck across the street from the bar. While Hubbard was parked, Officer Dick Duncan of the Cascade County sheriff's office, approached Hubbard's truck. Deputy Duncan asked Hubbard to

-3-

identify himself and advised Hubbard that there was going to be no trouble.

As Hubbard and Lodge were leaving the area of Wally's Bar, as requested by Deputy Duncan, Skelton approached Hubbard's truck and asked Hubbard to meet her and Fish at Fischer's Trailer Park, where she expected Fish and Miller to fight. Miller was a resident of the trailer park.

Skelton drove Fish's automobile to Fischer's Trailer Park but discovered that Miller had not yet arrived. Skelton and Fish parked their car adjacent to Fischer's Trailer Park. Hubbard and Lodge arrived and parked next to Skelton and Fish.

After twenty to forty minutes of waiting at the trailer park, Hubbard decided to go home for the night. Just as he was getting ready to leave, however, a car which was believed to be Miller's drove past. Fish and Skelton in one car, and Hubbard and Lodge in the other car, proceeded to follow.

The car spotted by the group actually contained Sally McCurdy, Miller's fiancee. She was being followed to Miller's trailer by a friend, Garth Lenci. Fish, Hubbard, Lodge and Skelton were unaware that Miller and a friend of his, Steven Triplett, were already inside the trailer when McCurdy arrived.

Upon arriving at Miller's trailer, Skelton parked the car a short distance away. Fish got out of the car and walked to where Lenci was parked. Sally McCurdy was already in the trailer at this time. Immediately after her arrival Miller had come to the trailer door and shouted to her to come inside.

Lenci testified that after Fish, Hubbard and Lodge walked up to his car Fish told him "they were going to do it right and get it done with." Lenci then testified he left as all three men approached Miller's trailer with Fish in the lead. Fish denies having made any such statement to Lenci and testified that Hubbard and Lodge did not arrive at Lenci's car until after he had started up the porch steps to Miller's trailer.

When Fish arrived at Miller's front door he began knocking. McCurdy, who was inside the trailer at the time, testified to seeing Hubbard and Lodge a few feet behind Fish. Triplett, who was also inside the trailer, stated he noticed an individual standing beside Fish but was unable to identify the person. Fish, Hubbard and Skelton testified that Lodge and Hubbard had stopped just off a concrete landing in front of Miller's trailer and were not on the porch with Fish.

As Fish was knocking on the door, the lights in the trailer went out. Fish said he continued to knock and shouted to Miller to "come out and get it over with." Sally McCurdy testified that Fish told Miller to come out or he would come in. Fish knocked on the door for approximately two minutes but testified he never attempted to force open the door, nor did he ever grab or handle the door knob in an attempt to open the door.

During this period of time Triplett, Miller and McCurdy were in the trailer living room. Without saying anything Miller went to his bedroom, obtained a rifle and returned to the kitchen to load it. Triplett testified that McCurdy then started yelling that they were going to have a shoot-out and told him to get in the back bedroom. McCurdy however does

not remember making any such statement. Triplett immediately left the living room and while on his way to the back door, heard Miller fire the rifle.

At the time the shot was fired by Miller, Fish testified that he had retreated and was standing about ten feet from the porch. He had heard the gun being cocked inside the trailer, which frightened him. At about the same time Fish testified that Lodge ran up on the porch and bumped against the door with his foot as the shot was fired by Miller. The prosecution presented the testimony of Skelton which indicated that Lodge was standing beside Fish when Lodge kicked the door two or three times.

The shot fired by Miller went through the front window adjacent to the trailer door and struck Lodge in the throat. Lodge's body was later found lying with his feet on the trailer door threshold. The door molding on the inside of the trailer and the door latch were also found ripped from the door casing. Shrapnel (i.e., trailer metal) from the shot by Miller struck Fish in the stomach and Hubbard in the lip and eye.

As the shot was fired, Fish and Hubbard ran from the vicinity of Miller's trailer. Hubbard retreated to the area of a tin shed adjacent to the trailer while Fish fled around the back side of the trailer and then headed towards his car. At this point, Miller came out of the trailer and fired two more shots, aiming his rifle in the direction of Hubbard. Hubbard then saw Miller run around the opposite side of the trailer.

Hubbard then returned to his truck and drove down to the immediate vicinity of the trailer porch. As he reached the trailer, Miller appeared and shoved a rifle through the

window of the truck and threatened Hubbard's life by yelling he was going to "blow his f_____g head off." A struggle for the rifle ensued, with Hubbard ultimately gaining possession.

After taking the rifle away from Miller, Hubbard went over to Lodge's body and observed that he had been shot in the neck. Hubbard, then seeing Miller moving away, aimed and fired the rifle at him. Hubbard stated that when he fired at Miller he was aiming at his right leg expecting to wing him so as to prevent him from leaving to obtain another weapon.

Fish, having witnessed the struggle over the rifle, testified that Hubbard missed Miller with the first shot and then fired at him again, Miller falling face down in the gravel. Hubbard testified that he hit Miller with the first shot and fired another into the ground to clear the chamber. A bullet from the rifle struck Miller in the small of the back at about belt level.

McCurdy, who had fled through the back of the trailer to get help, returned and went to the spot where Miller lay. While there, she testified, she heard Hubbard say, "He killed my friend so I killed him." She also testified to hearing Fish say, "Yes, we killed him." A deputy sheriff who arrived on the scene shortly after the incident also testified that Hubbard told him that he shot Miller because Miller had shot Lodge.

Both Lodge and Miller died as a result of wounds received that night.

Fish and Hubbard were charged jointly by amended information with deliberate homicide, attempted aggravated burglary and conspiracy to commit aggravated assault. The conspiracy charge was dropped prior to trial and the defendants pleaded not guilty to the remaining counts.

Defendants filed a motion to dismiss the amended information which was denied by the District Court. Fish then filed a motion for separate trial which was also denied.

Trial by jury commenced on April 4, 1979. On April 20, 1979, the jury returned a verdict of guilty against defendant Fish for attempted burglary. He was acquitted of attempted aggravated burglary and deliberate homicide. The codefendant, Hubbard, was convicted of mitigated deliberate homicide and acquitted of attempted aggravated burglary and attempted burglary.

Fish was sentenced to confinement in the Montana State Prison for a period of seven years and found to be a nondangerous offender. Hubbard was sentenced to prison for a period of twenty years and also found to be a nondangerous offender.

Fish and Hubbard both appeal.

Numerous issues have been raised by defendants on appeal, but this Court need only examine the following:

1. Whether defendant Fish's conviction for attempted burglary is supported by substantial evidence?

2. Whether the trial court properly excluded psychiatric testimony offered by defendant Hubbard?

To support an attempted burglary charge it is essential that the prosecution establish, with substantial and credible evidence, and beyond a reasonable doubt, that the defendant attempted to enter an occupied structure with the purpose to commit an offense therein. See sections 45-4-103 and 45-6-204, MCA.

It is a well-established principle that an attempt must consist of more than mere preparation and that there must be some overt act committed in furtherance of the offense

charged. Section 45-4-103(1), MCA; see also State v. Ribera (1979), ____ Mont. _____, 597 P.2d 1165, 36 St.Rep. 1292; State v. Rains (1917), 53 Mont. 424, 164 P. 540.

The only evidence presented at trial indicates that Fish was on the front porch of Miller's trailer knocking or pounding on the door. Fish testified as he was knocking he told Miller to come out and get it over with. There was testimony of Sally McCurdy, who was inside the trailer at the time, that Fish told Miller to come out or he would come in; however, no evidence was ever presented that Fish attempted to force open the door or that he ever grabbed or handled the door knob in an attempt to open the door.

Based upon a review of all of the evidence, in a light most favorable to the State, we are clearly unable to find that Fish's conduct at any time constituted an overt act that could be construed as an attempt to enter Miller's trailer. Mere knocking or pounding on a door does not reach far enough towards the accomplishment of the alleged desired result to gain entry into an occupied structure necessary to establish the crime of attempted burglary.

The State argues that if the actions of Fish do not establish attempted burglary, Fish is still guilty of that crime on a theory of accountability for the actions of Dale Lodge. We again must disagree.

A person is legally accountable for the conduct of another when:

> "(1) having a mental state described by the statute defining the offense, he causes another to perform the conduct, regardless of the legal capacity or mental state of another person;
>
> ". . .; or

"(3) either before or during the commission
of the offense with the purpose to promote
or facilitate such commission, he solicits,
aids, abets, agrees, or attempts to aid such
other person in the planning or commission
of the offense." Section 45-2-302, MCA.

The evidence presented at trial upon which the State basis its theory of accountability is testimony that after Fish stopped knocking on the trailer door, Lodge ran up next to Fish and may have kicked the door between one and three times before a shot was fired by Miller striking Lodge. Fish testified that he had retreated from the porch altogether when Lodge ran up to the door, kicking it with his foot as the shot was fired. Additional evidence was presented that the molding around the trailer door and the door latch were found torn off the door casing and that Lodge's body was found with his feet on the door threshold. However, it should be noted that no evidence was ever presented that the door was damaged as a result of any action by Lodge or Fish; in fact, no evidence to support how the damage occurred was ever presented.

Upon reviewing this evidence, again in a light most favorable to the State, we are unable to find that the prosecution has established those elements required to support a theory of legal accountability. There is no substantial credible evidence that Fish had any intent to enter Miller's trailer or that he solicited or aided Lodge when Lodge ran up to the door and allegedly kicked it.

In further support of the accountability theory, the State draws on the time Fish, Hubbard and Lodge were together earlier in the evening and on isolated remarks overheard from them, allegedly of an exceedingly violent nature and that all three were again present at Miller's

trailer when Lodge approached the trailer door. Yet, the record is bare of any evidence of any preparation by any of the three to carry out these alleged threats; no one was armed, not even with a stick or a rock. The record is more compatible with an intent by Fish to engage in a fist fight-- to which he admits. The State admits in the record that no weapons were found when the vehicles were searched. Miller was the only person armed. We acknowledge that there was an uncommon amount of activity that evening that made its way into the record, but we are compelled to reject the conclusion reached from this by the State.

The jury also refused to accept the theory of accountability, as is evidenced by the their inconsistent verdicts. They refused to find Hubbard accountable for actions of Fish or Lodge by failing to find him guilty of attempted burglary. And, they failed to find accountability again by not finding Fish guilty of mitigated deliberate homicide.

The definition of criminal accountability contemplates an active role in facilitating the commission of an offense. Consequently, more than mere presence at the scene of a crime is necessary to establish criminal responsibility. State ex rel. Murphy v. McKinnon (1976), 171 Mont. 120, 556 P.2d 906.

The second issue on appeal deals with the trial court's refusal to allow a psychiatrist to testify as to defendant Hubbard's mental state at the time Miller was shot.

With respect to either deliberate homicide or mitigated deliberate homicide, the State must prove that defendant "purposely or knowingly" caused the death of another human being. Sections 45-5-102 and 45-5-103, MCA.

"Purposely or knowingly" are statutory descriptions of various states of the human mind. See sections 45-2-101(52) and 45-2-101(27), MCA. They are particular elements included in the definition of the criminal offenses at issue. No element of an offense can be presumed, and, thus, the requisite state of mind must be established by the prosecution and believed by the jury beyond a reasonable doubt. See Patterson v. New York (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281; In re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368.

The prosecution must carry the burden of proving the requisite mental state of the defendant in this particular offense. Therefore, due process demands that the defendant be allowed to introduce evidence to rebut said evidence. Evidence should be admissible to prove or disprove the existence or nonexistence of a defendant's state of mind just as any other evidence is admissible to prove other elements of the crime charged.

The offered psychiatric testimony in this instance included a conclusion that Hubbard, under the surrounding circumstances, more than likely did not intend to kill Miller when he shot but only intended to stop and apprehend him. This testimony goes directly to the elements of "purposely or knowingly" and, thus, should have been admitted.

The State points out that defendant failed to give notice to the prosecution that he intended to rely on the defense of lack of the particular state of mind forming an element of the crime charged, as required by section 46-15-301(2)(a), MCA.

We acknowledge defendant's failure but note that section 46-15-301(2)(a), MCA, was amended in 1979, with the

-12-

amendment taking effect after defendant's trial. Subsequent to this amendment, the section provided that notice is only required if the defendant intends to rely on the defense of mental disease or defect. See section 95-1803(3)(a), R.C.M. 1947.

The testimony in this instance was not offered to support an affirmative defense of mental disease or defect but to support a general rebuttal to an allegation that defendant purposely and knowingly caused the death of another. This being the case, notice is not required.

Respondent further argues that even if notice is not required, the subject matter of the testimony is not proper for opinion testimony by an expert.

Rule 702, Mont.R.Evid., sets forth a two-prong test in determining the propriety of the use of expert testimony: (1) Is the subject matter such that it requires expert testimony; and (2) Is the particular witness qualified as an expert to give an opinion in the particular area of his testimony? See Commission Comment, Rule 702, Mont.R.Evid.

In regard to the subject matter of the expert testimony, general guidelines for admission were set forth in Leybold v. Fox Butte Theater Corporation (1936), 103 Mont. 232, 62 P.2d 223:

> ". . . When . . . it can be said as a matter of law that the jurors are equally capable of forming an opinion or can draw, or be readily directed how to draw, a reasonable inference, then the matter is not the subject of expert testimony. [Citations omitted.] In other words, when the conclusions to be drawn from the facts stated are within the range of ordinary training, intelligence, and common observation, expert testimony is not admissible. . ." 62 P.2d at 226.

See also Lamb v. Page (1969), 153 Mont. 171, 455 P.2d 337; State v. Campbell (1965), 146 Mont. 251, 405 P.2d 978.

We are unable to find that identification and description of a particular defendant's mental state, at a certain point in time, as effected by surrounding circumstances, clearly lies within the comprehension of laymen as based on common knowledge and expertise. With this being the case as to the determination of a defendant's state of mind at the time of alleged criminal conduct, expert testimony is proper.

The subject matter of the testimony being proper for expert testimony, and there being no dispute as to the qualifications of the psychiatrist, the offered testimony was improperly excluded from the jury. Furthermore, such a failure is prejudicial and, therefore, reversible error. To improperly exclude evidence and testimony offered by defendant as rebuttal to an essential element of the crime charged denies defendant a full evidentiary hearing and deprives him of his right to a fair trial. See Chambers v. Mississippi (1973), 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297; Jenkins v. McKeithen (1969), 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404, reh. denied, 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123.

The fact that we could reach a decision by treatment of a single issue in defendant Hubbard's appeal has no particular significance as to the validity of the remainder of the issues presented to this Court for review by Hubbard. It is the feeling of this Court that, in the event of another trial, matters that could not or in all probability would not again occur are better left alone, which serves the best interests of all concerned.

The conviction and judgment against defendant Fish is reversed and the cause dismissed.

The conviction and judgment against defendant Hubbard is reversed and the cause remanded to the District Court for a new trial.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

-15-