NO.   93-067

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

STATE OF MONTANA,

      Plaintiff and Respondent,

  V.

DOUGLAS DUANE TURNER,

      Defendant and Appellant.


APPEAL FROM:   District Court of the Third Judicial District,
                In and for the county of Powell,
                The Honorable Ted L. Mizner, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

          William F. Hooks, Appellate Defender Office,
          Helena, Montana

      For Respondent:

          Hon. Joseph P. Mazurek, Attorney General,
          Elizabeth S. Baker and John P. Connor, Jr.,
          Assistant Attorneys General, Helena, Montana

          Christopher G. Miller, Powell County Attorney,
          Deer Lodge, Montana

FILED

MAY 2 4 1994

Filed: *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted:  April 28, 1994

Decided:  May 24, 1994

_____
        Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

Defendant/appellant, Douglas Duane Turner, appeals from a jury verdict in the Third Judicial District Court, Powell County, convicting him of kidnapping by accountability, a felony, and five counts of deliberate homicide under Montana's felony-murder doctrine. Appellant is an inmate at the Montana State Prison where he was present during the riot on September 22, 1991, in which five inmates were killed.

We affirm.

Appellant raises three issues on appeal:

1. Did the District Court err when it failed to dismiss the felony-murder deliberate homicide convictions after the jury returned an inconclusive verdict on the burglary charge because the State failed to establish the underlying felony or prove a causal connection?

2. Did the District Court err when it failed to grant appellant's motion to dismiss on the ground that the State failed to preserve evidence?

3. Did the District Court err when it permitted the State to exhibit autopsy photographs of the five deceased inmates?

On September 22, 1991, the Montana State Prison housed 68 inmates in the maximum security unit. Ten of these inmates were in "protective custody" (PC) in D Block. The inmates had been placed in PC because their safety was in jeopardy from the other inmates at the prison. Within the maximum security unit, non-protective custody inmates were allowed access only to that part of the

building where they were housed, unless escorted through other areas in cuffs by corrections officers. PC inmates had more privileges and less restrained access within the unit.

The maximum security unit of the Montana State Prison is a rectangular building divided into six living blocks and two central control cages. Each block has two levels, with eight cells on each level. The west side of the building contains the main control cage and Blocks A, B, and C. The east side of the building contains the satellite control cage and Blocks D, E, and F. The two control stations in the maximum security unit contain electronic consoles which control all of the unit's gates and cell-block doors. The consoles contain keys that are used to shut off the power to the consoles. The main control cage is located in the center of the west half of the maximum security unit, and controls operations for Blocks A, B, and C, and other portions of the building. The satellite control cage controls operations for Blocks D, E, and F, and is located in the center of the east half of the unit, across the exercise yards from the west side of the unit. The cages are enclosed in glass.

On September 22, 1991, as was routine, thirteen maximum security inmates were escorted by five correctional officers to the exercise yard of the maximum security unit. The exercise yard is located in the center of the unit, and includes six 20' x 30' cages enclosed with chain-link fencing. Only three inmates are allowed to exercise in one cage at a time.

On the morning of September 22, 1991, some inmates removed some chain links from the fencing of the exercise cage without notice by the correctional officers. Removal of the chain links created a hole in the fencing of the exercise cage. The correctional officers came to the yard to escort the inmates back to their cells. They began with Yard Area Five because one of the inmates in that cage told the officers he needed to use the bathroom. The five officers working the floor of the unit that day escorted three inmates from Yard Area Five to C Block, where the inmates resided.

At that time, nine of the ten inmates remaining in the exercise yard came through the openings in the exercise cage fencing, and into the west side of the maximum security unit building which housed the main control cage. When the correctional officer working the main control cage noticed the inmates rushing in, he radioed to the command post that there was a riot. Several of the escaping inmates beat on the cage doors and windows with a telephone and a fire extinguisher. The inmates were yelling as they went. The inmates shattered the window on the outside of the cage. At that point the officer feared for his life and scaled the ladder out of the cage and escaped onto the roof where he locked the hatch from the roof. The officer operating the satellite cage controls began to close the chain-link gate which separates the east and west portions of the building.

Appellant was the first inmate to enter the east side of the building. He picked up a bucket and placed it in the path of the

4

closing gate, which propped it open. The correctional officer controlling the satellite cage called the control center for help. Then appellant ran to the east cage and smashed the cage windows with a chair. This officer also feared a face-to-face confrontation with the inmates and escaped through the roof hatch, leaving behind the console keys.

Meanwhile, the five officers who had escorted the three inmates to C Block became locked in C Block, and took refuge inside a 3' x 5' shower room and locked the door with a padlock. The officers remained in the shower for the duration of the riot--about three hours.

The D Block inmates who were in PC were freed from their cells by the inmates controlling the door latches at the satellite cage. The PC inmates began breaking up broom handles for weapons to protect themselves in the event the rioters got the Block doors opened. They built a barricade on one staircase leading from the lower to the upper level of D Block. However, the rioters entered D Block through the upper level and took the PC inmates by surprise. All the PC inmates were beaten by the rioters and five of them were killed.

Testimony at trial placed appellant on D Block during the riot. He was seen by one of the beaten PC inmates walking around with William Gollehon checking to see if the PC inmates were dead, and approaching the cell of one of the PC inmates who was killed. Another PC inmate testified that appellant and Gollehon attempted to hang another PC inmate from the railing of the upper level of

5

D Block. They were unsuccessful in that attempt and eventually pushed him off the upper level to the floor 18 feet below, which resulted in his death.

Appellant also was identified as one of the rioters who attacked two other PC inmates, and threw one over the D Block railing. This inmate also died as a result of his injuries. Numerous other witnesses placed appellant in D Block going through the fire doors and attacking other PC inmates.

Appellant testified and admitted to involvement in the riot, including the planning of the riot, the escape from the yard, placing the bucket in the doorway between the east and west sides of the building, and beating on the east control cage windows. However, he denied ever going onto D Block during the riot and denied any involvement in causing injury to other inmates. Appellant called witnesses who also were inmates charged with offenses as a result of the riot, and who testified only that appellant was not on D Block during the riot.

The riot was quelled by the prison's Disturbance Control Team, which entered the building at approximately 2:00 that afternoon.

On February 3, 1992, appellant was charged by information in the Third Judicial District Court with Count I, kidnapping by accountability, in violation of §§ 45-5-302 and 45-2-302, MCA; Count II, burglary, in violation of § 45-6-204, MCA; and Counts III through VII, deliberate homicide, five counts, in violation of § 45+-102(1)(b), MCA (the felony-murder rule).

6

The jury trial commenced on July 17, 1992. During jury deliberation, the jury presented the District Court with the following inquiry regarding the burglary charge:

> Can a person be innocent of burglary yet accountable to said burglary, therefore guilty of deliberate homicide by means of Instructions 24 through 28, part 1?

The court answered and stated to counsel for the record:

> In that regard, Instruction 24 through 28 read, in pertinent part, "That to convict the Defendant of the charge of deliberate homicide set forth in Count,-- of each particular Count of the Information, the State must prove the following elements: #1, that the Defendant committed or is legally accountable for the commission of burglary." The Court has previously told the Jury that under Count 2, the Defendant has not been charged with accountability for burglary. The question then arises whether or not the Defendant can be convicted of deliberate homicide given the instructions as read into the record at this time. The Court proposes to answer the question of the Jury with a simple yes.

At the end of the deliberations, the jury advised the court that it was unable to reach a unanimous verdict on the burglary charge. Thereafter, appellant moved the court for a mistrial as to the burglary charge and the five counts of deliberate homicide on the grounds that the conviction of the underlying burglary was necessary for conviction of deliberate homicide under the felony-murder statute, § 45-5-102(1)(b), MCA, and State v. Weinberger (1983), 206 Mont. 110, 671 P.2d 567. On July 28, 1992, the court ordered the parties to file simultaneous briefs regarding defendant's motion to dismiss. On August 10, 1992, appellant also filed a motion to set aside the verdict, again on the grounds that the conviction of the underlying burglary was necessary for conviction of deliberate homicide under the felony-murder statute

7

and _Weinberaer._  Appellant argued that unless the burglary count was charged by accountability, the jury could not return guilty verdicts on the five felony-murder counts because it did not reach a unanimous decision on the underlying charge.  The State replied that it was not necessary that the jury find that appellant actually committed the burglary by being present on D Block with the intent to riot.  Instead, the State argued that in order to find appellant guilty of the homicides under the felony-murder rule, it only had to provide evidence sufficient for the jury to find that appellant aided or facilitated the commission of the offense of burglary.

On September 15, 1992, the District Court denied appellant's motion to set aside the verdict.  The court found that the jury had been instructed properly on accountability, and that failure by the jury to return a verdict on the burglary charge did not require dismissal of the five convictions of deliberate homicide.

On October 8, 1992, the District Court proceeded with sentencing without objection.  Also on October 8, 1992, the State moved the District Court to dismiss the burglary count with prejudice.  On October 13, 1992, the court temporarily dismissed the burglary charge, without prejudice.  On October 14, 1992, the court entered its judgment and sentenced appellant to a term of ten years in the Montana State Prison for the kidnapping conviction, and to a term of life imprisonment on each of the five counts of deliberate homicide, for a total of five terms of life imprisonment.  The five life terms imposed for the charges of

deliberate homicide are to run concurrently, but run consecutively to the term imposed for the kidnapping conviction, and the sentence previously imposed for which appellant was already incarcerated.

On September 24, 1992, appellant petitioned this Court for a writ of supervisory control to review an order of the District Court authorizing retrial on the burglary count which could violate the double jeopardy protection of the Constitution and § 46-11-503, MCA. Turner v. District Court of the Third Judicial Dist. (1992), No. 92-460, Montana Supreme Court. This Court denied the writ on November 2, 1992, because by the time of sentencing, the State had moved to dismiss the burglary charge with prejudice, and because it did not intend to retry that charge, appellant was no longer subject to the possibility of double jeopardy.

After appellant's application for writ of supervisory control had been denied by this Court, on November 10, 1992, the District Court granted the State's motion of October 8, 1992, to dismiss the burglary charge with prejudice.

On November 12, 1992, appellant filed a notice of appeal with this Court. On February 8, 1993, the District Court ordered the appellate defender as substitute counsel of record on appeal.

<u>ISSUE 1</u>

Did the District Court err when it failed to dismiss the felony-murder deliberate homicide convictions after the jury returned an inconclusive verdict on the burglary charge because the State failed to establish the underlying felony or prove a causal connection?

9

Appellant argues that the deliberate homicide charges were based on an uncharged predicate felony, burglary by accountability, which was not tried or submitted to the jury. He asserts that because those charges were based instead on burglary, the State had to prove that either he or any person legally accountable for the burglary killed another person during the course of the burglary. He asserts that the jury's failure to return a verdict on the burglary charge established that the State failed to sustain its burden of proof. Further, he asserts that the blank verdict form constitutes an acquittal of the burglary charge, and thus mandates reversal of the deliberate homicide convictions.

Finally, appellant argues that for three reasons, the evidence did not sufficiently establish that he committed attempted burglary. First, appellant's act of propping open the door to gain access to the east side of the building did not constitute unlawful entry or remaining in an occupied structure (D Block), pursuant to the burglary statute. Second, appellant was not the only inmate to help prop open the door. Third, appellant submits that the State failed to establish the requisite causal connection between his alleged felonious act and the deaths.

The felony-murder statute provides:

(1)  A person commits the offense of deliberate homicide if:
. . . .
   (b) he attempts to commit, commits, or is legally accountable for the attempt or commission of robbery, sexual intercourse without consent, arson, burglary, kidnapping, aggravated kidnapping, felonious escape, felony assault, aggravated assault, or any other forcible felony and in the course of the forcible felony or flight

thereafter, he or any person legally accountable for the crime causes the death of another human being.

Section 45-5-102(1)(b), MCA.

Under the court's instruction pursuant to this statute and the wording in the information, the jury could have found that appellant either committed burglary or was legally accountable for its commission. The charging document mirrored the language of the felony-murder statute. Each deliberate homicide count read as follows:

> On or about the 22nd day of September, 1991, at Montana State Prison, Powell County, State of Montana, the above-named defendant, with the purpose of promoting or facilitating the offense of burglary, aided, abetted or attempted to aid other inmates in the maximum security unit in the planning or commission of the offense of burglary and in the course of said burglary, the defendant or other persons legally accountable for said burglary, caused the death of . . . . [Emphasis added].

Appellant does not argue that the burglary and deliberate homicide verdicts are inconsistent. Instead, he asserts there was a failure to convict on the predicate felony which now requires reversal of the deliberate homicide convictions.

We have held that an underlying felony in a deliberate homicide pursuant to § 45-5-102(1)(b), MCA, is not a lesser-included offense, but is a distinct offense. State v. Kills on Top (1990), 243 Mont. 56, 92, 793 P.2d 1273, 1297. Appellant's charges of burglary and felony-murder are distinct offenses and not inconsistent.

Although we said in Weinberger that "half of the felony murder rule is a felony," it does not follow from this statement that there must be a conviction for that felony. See Weinberaer, 671

11

P.2d at 580. In Weinberser, Adam Weinberger was charged with two counts of deliberate homicide. In Count I, Adam was charged with aiding and abetting his father, Arrow Weinberger, in causing a death, pursuant to §§ 45-5-102(1)(a) (deliberate homicide) and 45-2-302(3), MCA (1978) (when accountability exists). In Count II, Adam was charged with felony-murder, pursuant to §§ 45-5-102(1)(b) (felony-murder rule), 45-4-103 (attempt), and 45-5-202(1)(c) (aggravated assault), MCA (1978). Adam's father shot and killed the victim while Adam attempted the crime of aggravated assault against the victim. Because of the manner in which Adam Weinberger was charged and the jury was instructed, the jury was required to acquit him of one of the two charges. Implicit in the Weinberser jury's acquittal of Adam of the aiding and abetting charge was a finding that he and his father had not agreed to kill the victim. We found that the evidence supported the jury's finding, and after we examined the other charge--the underlying felony of attempted aggravated assault--we concluded that the evidence did not support the felony-murder conviction either.

In Weinberaer, we clarified that the basis for our decision was the State's failure to prove that the defendant was engaged in an attempt to commit a felony. Weinberser, 671 P.2d at 580. We noted that a completed attempt or completed felony was not required in order for the felony-murder rule to apply. Weinberger, 671 P.2d at 580. A conviction under the felony-murder rule requires that the evidence support a finding as to each element of deliberate homicide including the underlying offense, not that there be a

12

conviction for a completed felony. This principle is consistent with our decision in _Weinberaer._ There the State failed to prove the underlying offense.

Accountability for the deliberate homicides means that appellant played an active role in facilitating the commission of the burglary. _See_ State v. Fish (1980), 190 Mont. 461, 471, 621 P.2d 1072, 1078. In the case on appeal, the jury heard overwhelming proof of appellant's participation in the plan and design of the underlying felony and intent to riot. In addition, the jury heard overwhelming substantial credible evidence so as to make appellant chargeable for the incident of the homicides by accountability and for several of the homicides directly. Appellant _admitted_ to blocking the entrance gate to the east side of the building which facilitated at least some other inmates in committing the homicides in D Block. Even though the jury did not find appellant guilty of knowingly committing the burglary, it is consistent that appellant could still be found guilty of attempting to aid others in the commission of a burglary which resulted in death of other human beings. In light of such overwhelming evidence of appellant's guilt, we will not overturn the jury's conviction of deliberate homicide by accountability. The State introduced proof beyond a reasonable doubt that appellant promoted or facilitated the offense of burglary by aiding and abetting or attempting to aid and abet other inmates in maximum security in the planning or commission of the burglary.

We also disagree that the jury's inconclusive verdict on the burglary charge established that the State failed to sustain its burden of proof, and therefore, mandates reversal of the homicide convictions.

Appellant argues that under Weingerger a blank verdict form is a not-guilty verdict. We disagree. The jury in Weinberaer returned an inconclusive verdict as to Count I, finding Adam neither guilty nor not guilty of aiding and abetting Arrow in the death. This Court regarded the inconclusive verdict as one of not guilty, as it was so treated by the parties and was not disputed. Weinberser, 671 P.2d at 568. Also, Weinberaer is distinguishable from this case because Weinberger's two charges were pled in the nature of alternative charges, where the conviction of one charge required the acquittal of the other.

The meaning of the jury's blank verdict in this case has no impact on the ultimate issue because we know why the jury intended to leave the verdict form blank on the burglary charge. After deliberations, the jury communicated to the court that it left the jury verdict form blank on the burglary charge because it was unable to reach a unanimous verdict. The record shows that during jury deliberations, the jury asked the court: "Can a person be innocent of burglary yet accountable to said burglary, therefore guilty of deliberate homicide . . . ?" The court responded in the affirmative. We cannot speculate on how or why the jury failed to reach a verdict on the burglary charge. We decline to define the

14

meaning of a blank verdict form in any given case or state a general rule.

Finally, appellant asserts that the State did not sufficiently prove that he committed burglary. He asserts that his initial act which facilitated the entry onto D Block by others could not establish entry or remaining in an occupied structure. We disagree. In a companion case from the September 22, 1991, prison riot, we held that D Block is an occupied structure. State v. Gollehon (Mont. 1993), 864 P.2d 1257, 1262, 50 St. Rep. 1564, 1567. We said that D Block is an independent area of the maximum security unit which is separately secured and that Gollehon's entrance into that structure for the purpose of committing an offense therein constituted a burglary. Appellant's actions of escaping through the chain-link fencing and propping open the door to gain access to D Block made him accountable for the unlawful entry into D Block by other inmates. Proof that he unlawfully entered or remained in D Block was not necessary to find him so accountable. Appellant's assertion that the State failed to provide proof that he was accountable for burglary because he was not the only inmate to help prop open the door is without merit.

Finally, appellant's contention that the State failed to establish the requisite causal connection between his alleged felonious act and the deaths is without merit. Appellant argues that "more than a mere presence at the scene of a crime is necessary to establish criminal responsibility." (quoting Fish, 621 P.2d at 1078). In addition, he asserts that Montana law

15

requires the presence of a causal connection between the felonious act and the death. State ex rel. Murphy v. McKinnon (1976), 171 Mont. 120, 127, 556 P.2d 906, 910.

Montana law defines a causal relationship as the cause of a result if without the conduct the result would not have happened. Section 45-2-201, MCA. The record shows that appellant was more than merely present at the scene of the crime. He facilitated the burglary when he propped open the entrance gate to the east side of the building. In addition, Montana's felony-murder statute itself supplies the causal connection element by requiring that the death occur "in the course of the forcible felony or flight thereafter." Section 45-5-102(1)(b), MCA. The evidence was that the deaths occurred in the course of the burglary--a felony that appellant facilitated when he secured the inmates' access to D Block by propping open the east entrance gate. The State established the requisite causal connection between appellant's felonious act and the deaths.

Regardless of the inadequate explanation for the jury's blank verdict on the burglary charge, the record contains overwhelming substantial credible evidence to support the jury's verdict of guilty for the homicide charges. The question is not whether appellant was convicted of the burglary charge, but whether the deliberate homicide convictions were supported by substantial credible evidence as to each element of that offense. The record shows such evidence was provided the jury.

16

We hold that the District Court did not err when it failed to dismiss the felony-murder deliberate homicide convictions after the jury returned an inconclusive verdict on the burglary charge.

<u>ISSUE 2</u>

Did the District Court err when it failed to grant appellant's motion to dismiss on the ground that the State failed to preserve evidence?

Appellant argues that he was denied due process when he was prejudiced by the State's failure to preserve his coverall clothing and tennis shoes worn during the riot. Appellant claims that the evidence was material and exculpatory, and would have tended to clear him of guilt and vitiate his convictions. Appellant asserts that in a riot situation where the actors are unknown, the clothing and personal effects upon which blood spatters and other matter would be found, would tend to help establish who participated and who did not. Appellant argues that the State's failure to preserve this evidence was negligent and warrants dismissal of the homicide charges.

Once prison officials secured the maximum security unit after the riot, inmates in the unit were stripped of their clothing, and the clothing was eventually discarded. Removal of the inmates' clothing is standard tactical procedure in order for officers to do a thorough and quick inspection for weapons which could be hidden on an inmate's person, and to ensure the safety of the officers and the other inmates. At the time the control team began this procedure, it was not aware that inmates had been killed.

17

Investigators initially made some effort to examine some of the clothing for identification, but abandoned the effort upon realizing the impossibility of the task. Testimony reveals that the inmates' orange coveralls were strewn about the maximum security building, and inmates had changed clothing frequently during the disturbance.

This issue and the facts and circumstances presented here are identical to those presented in Gollehon. In Gollehon, we held that the destruction of the inmates' clothing from the September 22, 1991, riot did not provide a basis for reversing the defendant's convictions. Our holding in this case is the same.

In Gollehon, we said that a defendant must show a deliberate or intentional suppression of exculpatory and constitutionally material evidence in order to claim a per se violation of due process. Gollehon, 864 P.2d at 1264-65 (citing State v. Sadowski (1991), 247 Mont. 63, 79, 805 P.2d 537, 547; and State v. Halter (1989), 238 Mont. 408, 412, 777 P.2d 1313, 1316). In order to vitiate a conviction, "negligently suppressed evidence must be material and of substantial use, vital to the defense, and exculpatory." Sadowski, 805 P.2d at 547.

We still are convinced that the inmates' clothing was not constitutionally material. There was no showing that the clothing was destroyed with the knowledge of its potential exculpatory value or that the evidence was of such a nature that appellant would be unable to obtain comparable evidence. See Gollehon, 864 P.2d at 1265. We still are convinced also that the prison officials'

18

objective when "ordering the inmates to strip was to get the unit under control and to restrain the rioting inmates from further violence." See Gollehon, 864 P.2d at 1265. Finally, appellant failed to show that even if he had been able to establish the absence of blood on his clothing or that any blood was his own, he failed to establish that the evidence would have vitiated his accountability for the deaths of the inmates during the riot.

We hold that the District Court did not err when it denied appellant's motion to dismiss on the ground that the State failed to preserve his clothing.

## ISSUE 3

Did the District Court err when it permitted the State to exhibit autopsy photographs of the five deceased inmates?

Appellant asks that we reconsider this issue, identical to one raised in Gollehon, and reverse our holding. Appellant argues that certain autopsy photographs admitted into evidence were inflammatory, which unduly and unfairly prejudiced him because the prejudice outweighed the probative value. He asserts that the autopsy photographs were neither relevant and probative to the kidnapping charge, nor substantially necessary or instructive on any material fact or condition in issue. Finally, appellant argues that the evidence was cumulative because the State already had presented photographic evidence of the victims' identities, and of the damage and destruction in the building lobby, guard control cages, hallways, catwalks, and offices.

19

As in <u>Gollehon</u>, the State introduced 20 autopsy photographs during the medical examiner's testimony, which depicted the five slain inmates. In <u>Gollehon,</u> we held that although the photographs depicted the brutality and viciousness of the crimes committed, they were admissible. <u>Gollehon,</u> 864 P.2d at 1263. They did not arouse the jurors' passions any more than other evidence of the defendant's conduct. <u>Gollehon,</u> 864 P.2d at 1263. We also stated that we would "not demand that a trial be sanitized to the point that important and probative evidence must be excluded." <u>Gollehon,</u> 864 P.2d at 1263. Recently, we affirmed this standard in State v. Mergenthaler (Mont. 1993), 868 P.2d 560, 564, 51 St. Rep. 13, 16.

The trial court properly admitted autopsy photographs during the medical examiner's testimony. As in <u>Gollehon</u>, the photographs were displayed during the medical examiner's testimony approximately 10 to 15 feet from the jury box. The photographs were not individually handed to the jury in any fashion, and at the conclusion of the testimony were sealed and did not go to the jury room during deliberations.

Appellant was not prejudiced by admission of the photographs. The photographs' probative value outweighed any prejudice because they fairly and accurately represented relevant evidence, even though they depicted brutality and viciousness. The evidence was used to corroborate much of the inmates' testimony concerning the actions of appellant and others during the riot, the credibility of which was hotly disputed at trial.

The photographs were not cumulative because they were necessarily instructive for purposes of explaining the medical examiner's testimony with respect to the autopsies performed. The photographs simplified the examiner's task of attempting to explain the victims' injuries to the jury. Finally, the photographs had probative value because a jury is entitled to know the nature and extent of the injuries. State v. Henry (1990), 241Mont. 524, 531, 788 P.2d 316, 320.

We hold that the District Court did not err when it permitted the State to exhibit autopsy photographs of the five deceased inmates.

In our reading of the entire record of this case, from the filing of the information against appellant to the final judgment of the court, it is clear that appellant had a fair trial.

We affirm.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

21

_____

                /s/ John Conway Harrison

                /s/ [signature]
                Justices

Justice James C. Nelson did not participate in this decision.

22

May 24, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:


William F. Hooks
Appellate Defender
Capitol Station, PO Box 200145
Helena, MT 59620-0145

Hon. Joseph P. Mazurek, Attorney General
Elizabeth S. Baker, Assistant
John Conner, Special Prosecutor
215 N. Sanders, Justice Building
Helena, MT 59620

Christopher Miller
County Attorney
Powell County Courthouse
Deer Lodge, MT 59722

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
   Deputy